Cloyd ALVARADO, Appellant,

v.

STATE of Alaska, Appellee.

No. 1230.

Supreme Court of Alaska.

July 6, 1971.

John S. Hedland and Christopher R. Cooke, Alaska Legal Services, Anchorage, for appellant.

G. Kent Edwards, Atty. Gen., Juneau, Harold W. Tobey, Dist. Atty., Keith E. Brown and Robert L. Eastaugh, Asst. Dist. Attys., Anchorage, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

BONEY, Chief Justice.

Appellant, Cloyd Alvarado, seeks reversal of his conviction below, contending that the jury which found him guilty was improperly constituted. Challenged as unconstitutional is the long-standing practice in the third judicial district of selecting all prospective jurors from the area within a radius of 15 miles of Anchorage. Though this court has previously upheld the use of juries drawn exclusively from the Anchorage area,[1] the factual circumstances of Alvarado's case, as well as the detailed presentation made in the record on appeal, compel a reexamination of existing jury selection practices.

The procedural setting from which Alvarado's claim arises is not complicated. On August 19, 1969, an indictment was issued charging Alvarado with the commission of a rape at or near Chignik, Alaska. Alvarado was arrested in Chignik and transported to Anchorage; a plea of not guilty was subsequently entered at arraignment, and trial was set for October 15, 1969, in the superior court, third judicial district, Anchorage. Immediately prior to commencement of trial, defense counsel challenged the entire array of petit jurors selected to hear Alvarado's case.[2] Objection to the panel was directed at the use of the 15-mile limit in the selection of prospec-

---

1. Crawford v. State, 408 P.2d 1002 (Alaska (1965). *See also* Bachner v. Pearson, 479 P.2d 319, 332–333 (Alaska 1970); West v. State, 409 P.2d 847 (Alaska 1966).

2. The record on appeal discloses that no Native jurors appeared on the panel summoned for Alvarado's trial.

tive jurors, and at the court's failure to revise jury rolls in accordance with recent amendments to AS 09.20.050.[3] The court denied this challenge, and trial proceeded.

Review of the course of events at trial need not be extensive for the purposes of this appeal. The prosecution sought to establish that on August 16, 1969, Alvarado forcibly raped his 14-year-old sister-in-law after having induced the girl to accompany him to a remote spot near the village of Chignik. In his own defense, Alvarado testified that at the time of the alleged incident the village was in the midst of celebrating the completion of the fishing season. He stated that there had been prolonged and heavy drinking; he claimed that at the time he was extremely intoxicated, and that he remembered nothing. The jury returned a verdict of guilty against Alvarado, and judgment of conviction was duly entered on December 31, 1969.

Early in January 1970 Alvarado filed notice of appeal, raising as his sole issue the propriety of the manner in which jurors were selected for his trial. Joined by the state, Alvarado filed a motion and stipulation to remand the case to the superior court in order to permit supplementation of the record. This motion was granted, and on April 16–17, 1970, a hearing was conducted at which documentary evidence was admitted and testimony of witnesses taken. The evidence and testimony adduced focused upon Alvarado's life history and upon the cultural and social conditions prevailing in Chignik, the scene of the crime. A synopsis of the information and data which emerged from this supplementary hearing will be apposite at this point.

Born in San Francisco on February 1, 1948, Cloyd Alvarado is the son of a Spanish father and a mother who is half Aleut; he is one-quarter Aleut by blood. Alvara-

do's mother is originally from Chignik, Alaska. One or two years after Alvarado's birth, his parents returned to the village of Chignik, where his father pursued a livelihood as a fisherman. Alvarado's childhood and youth were marked by intervals of varying length spent living in Chignik, interspersed with journeys of considerable duration to Seattle, Kodiak, and California. The life cycle of the Alvarado family revolved around the Chignik fishing season; even when the family lived away from Chignik, they returned almost every summer to fish. By 1968, when Alvarado was twenty years of age, he had lived in Chignik a total of about ten or eleven years, slightly more than half his life. Thus, throughout his life, Alvarado retained strong ties with the village of Chignik, and with his mother's family, which resided there.

Only a limited education was afforded to Alvarado. He attended school in Chignik through the sixth or seventh grade; his last year of schooling, spent in the seventh grade, was at Kodiak. Although he went to school through the seventh grade, Alvarado's education was repeatedly disrupted, both by the considerable periods of time his family spent living away from Chignik and by the frequent necessity to work in order to help support the family. In consequence, the actual time he spent in school amounted to no more than about three or four years. Probably as a result of these constant interruptions, Alvarado was still functionally illiterate at the time of his trial. Alvarado's knowledge of the Aleut langauge is limited. He speaks little Aleut, although he is able to understand much of what is said. Aleut is spoken at home with his wife, however.

Residence in Chignik of a permanent nature was established by Alvarado some time during 1966 or 1967, when he married

---

3. As amended, AS 09.20.050 provides for expansion of the sources from which jury lists are compiled. In Green v. State, 462 P.2d 994 (Alaska 1969), decided subsequent to Alvarado's trial, we held that recompilation of jury lists to conform

to the amended version of AS 09.20.050 would not be required until the regular biennial revision date. In light of our decision in Green, Alvarado has abandoned his claim with respect to this aspect of the jury's composition.

Katherine Anderson, a full-blooded Aleut, born and reared in Chignik. After the marriage, he and his wife lived with his wife's family, some twelve or thirteen people, in a small house in the village. During the summer, Alvarado occupied himself with commercial fishing, and winters were spent hunting, smoking fish, packing water, and otherwise generally subsisting. Alvarado considers himself to be an experienced and able fisherman, and testified that he enjoyed life in the village of Chignik. In June of 1969 a child was born to Alvarado and his wife.

Three separate evaluations of Alvarado's personal history were proffered in the course of the proceedings below and are preserved in the record on appeal. Robert Spinde, the probation officer charged with preparation of Alvarado's presentence report, James R. Jeffers, a psychologist who conducted a psychological evaluation of Alvarado, and William Babcock, a professor of sociology at Anchorage Community College who testified after listening to Alvarado in court, all concurred in the view that Alvarado was more closely allied to the life style of Chignik and to the Alaska Native culture than he was to the urban life style prevalent in Anchorage.

Essential information pertaining to the village of Chignik, and to Alaska villages in general, is also contained in the record. Chignik is a Native village [4] located on the Alaska Peninsula about 450 air miles southwest of Anchorage. Of a population of approximately one hundred inhabitants, about 95 are Alaska Natives. Apparently nearly everyone in the village is related. There are only about fourteen houses in the entire village.

None of the usual conveniences available in cities such as Anchorage are known to Chignik. For example, there is no television or running water; there are no roads or cars. Principal means of access to the village is by a weekly plane. Chignik's only industry is a single cannery, which operates during the summer. Employment in the village consists primarily of commercial fishing during the season and is sporadic the rest of the year. There is some trapping and subsistence hunting and fishing. During the winter, when there is no cash income, residents of the village knit sweaters and make mukluks, clothes, and various artifacts. Home brew liquor is consumed in the village, and extended drinking parties involving most of the village are not uncommon.

Extensive attention was also devoted in the proceedings below to the salient characteristics of Alaska Native cultures. Dr. Frederick Hadleigh-West, an anthropologist specializing in the study of Northern peoples, filed an affidavit which sets out factors distinguishing Native cultures from those prevailing in the urban centers of Alaska.[5] He states that Native cultures persist in Alaska, and that their distinguishing characteristics

> include economies which rely on hunting, fishing, and gathering activities, strong kinship bonds, isolation from those parts of Alaska that approximate mainstream America, different seasonal activity patterns, concepts of time and scheduling, which in accordance with other cultural divergences, may be quite different from those of mainstream America, and finally, very limited participation in the cash economy.

The conclusion drawn by Dr. Hadleigh-West is "[t]hat very profound cultural differences exist between the Native villages and urban areas of Alaska."

4. A suitable definition of what constitutes an Alaska Native village is provided in the record on appeal: "[A] place of 25 or more persons, half or more of whom are Natives." Fed. Field Comm. for Dev. Planning in Alaska, Estimates of Native Population in Villages, Towns, and Boroughs of Alaska (January 1969).

5. Dr. Hadleigh-West defined culture as "a distinct shared body of learned behavior among people encompassing such factors as mores, economics, language, education, geography, technology, religion, ethnic background and world view."

Knowledgeable evidence of cultural distinctions between Native villages and urban centers of Alaska was further provided in the form of an affidavit submitted by Willard Bowman, former Executive Director of the Alaska Human Rights Commission. Bowman states that in the course of his duties he became "acutely aware of the discriminations, class distinctions, and cultural differences which set the Alaska Native apart from the rest of Alaskan society." According to Bowman, instances of discrimination against Native Alaskans are frequent; Alaska Natives, especially village Natives, are generally regarded as a distinct subculture. Significantly, Bowman notes that

> [m]ost urban Alaskans are generally unaware and ignorant of the way of life in Alaska's Native towns and villages. They are not sensitive to the vast cultural differences which exist between their own way of life and that of the villages.

The testimony of William Babcock, a professor of sociology with a background of experience working in Native villages, indicates that although most Native villages are exposed to some extent to the effects of the dominant culture of the cities, the gap separating Native villages from the mainstream of urban society is vast. Examples of the unique qualities of Native culture given by Babcock encompass such factors as distinct sexual mores of the Native community, childhood exposure to two languages, cultural disorientation reflecting the imposition on the Native villages of the dominant society's way of life,

a distinct social history, completely different drinking patterns, and basic differences in family structure.

Underscoring the biographical and sociological evidence adduced below is the statistical presentation incorporated in the record.[6] Alaska Natives comprise about one-fifth of the population of Alaska. Of a total population numbering around 150,000 in the third judicial district, about one-tenth are Natives. When the Anchorage area is considered alone, the Native constituency drops to only about 3.5% of the population; conversely, if the entire third judicial district is considered with the exception of the Anchorage area, 29% of the people are Natives.[7] The statistics also show that there are 55 Native villages in the third judicial district and that these villages comprise 72% of the district's Native population. Only one of these villages, Eklutna, with an estimated population of 35 Natives, falls within the scope of the Greater Anchorage Area Borough.

Leaving consideration of the record aside for the present, we turn now to the arguments advanced on appeal. The primary contention raised by Alvarado is that the practice in the third judicial district of selecting juries from within a 15-mile radius of Anchorage precluded residents of the village of Chignik, and, for that matter, residents of virtually all Native villages, from representation on the jury panel. Citing the disparity between the life style of an Alaska villager and the life typically led by residents of the Anchorage area, Alvarado submits that the almost total ex-

---

6. Population statistics adduced by Alvarado are based upon the report of the Fed. Field Comm. for Dev. Planning in Alaska, *supra* n. 4. Contained in the record is the affidavit of Robert D. Arnold, who supervised the compilation of the Committee's report, attesting to the fact that the "1969 Estimates is the current standard source of statistics on Alaska Native population."

7. The precise figures shown in the record are:

| Total population of third judicial district | 149,617 |
|---|---|

| Native population, third judicial district | 149,617 |
|---|---|
| Population of the Greater Anchorage Area Borough | 113,522 |
| Native population in the Greater Anchorage Area Borough | 4,000 |
| Total population of third judicial district excluding Greater Anchorage Area Borough | 36,095 |
| Native population of third judicial district excluding Greater Anchorage Area Borough | 10,375 |

clusion from jury service of village residents occasioned by use of the 15-mile limit had the effect of depriving him of his constitutional right to an impartial jury.[8]

As a means of bolstering this argument, Alvarado points to the traditional concept of vicinage, which in its ancient and rigid form, required that jurors be drawn from the immediate vicinity or neighborhood in which a crime was committed.[9] While conceding that vicinage in the historical sense is no longer a formal requirement, Alvarado nonetheless maintains that the concept retains vitality as an ingredient of the constitutionally guaranteed right to an impartial jury: "[v]icinage serves primarily as a guide to determining whether the area from which jurors are chosen is a properly representative 'community'." Accordingly, he asserts that vicinage "is no longer a mechanical formula which requires, in all cases, that the jury be selected from the precise locale of the crime, but is an aspect of the right to a jury truly representative of the community."

Seeking to discredit Alvarado's position, the state argues that the Anchorage 15-mile jury selection limit is a justifiable and necessary means of avoiding the inordinate expense of transporting prospective jurors to Anchorage from remote areas of the state. Contrary to Alvarado's

stand, the state contends that the selection of jurors from among the population of the Anchorage area did not adversely affect the impartiality of Alvarado's jury. Moreover, the state points out that Alaska's Constitution does not contain any specific reference to vicinage which could be construed to have required inclusion of Chignik in the area from which prospective jurors were drawn. Thus we are urged by the state to uphold in this appeal the methods of jury selection employed within the third judicial district.

The right to trial before an impartial jury is explicitly secured to individuals accused of crimes by article I, section 11 of the Alaska Constitution, which provides:

In all criminal prosecutions, the accused shall have the right to a speedy and public trial, by an impartial jury * * *.

Similar protection is assured by the sixth amendment of the United States Constitution:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law. * * *

8. Alvarado further asserts that the Anchorage 15-mile limit, by excluding residents of Native villages from participation in the jury process, amounts to a violation of the right to equal protection of the law. Because of our disposition concerning Alvarado's right to an impartial jury and to due process of law, we do not adjudicate the merits of his equal protection claim.

9. The common law requirement of vicinage was transformed and broadened by the drafters of the Bill of Rights, and is now preserved in the sixth amendment, which provides for trial by a "jury of the State and district wherein the crime shall have been committed * * *." The form of the vicinage requirement ultimately adopted in the language of the sixth amendment represents a compromise between the

strict common law requirement, which compelled selection of the jurors from the neighborhood or county of the crime, and the original form of the Constitution, which omitted all reference to the area from which jurors were to be selected. It is generally agreed that the term "district", as used in the language of the sixth amendment, was intended to refer to judicial districts established by Congress. For informative historical discussions of the vicinage requirement, see Blume, The Place of Trial of Criminal Cases, 43 Mich.L.Rev. 59 (1944); Williams v. Florida, 399 U.S. 78, 93–97, 90 S.Ct. 1893, 26 L.Ed.2d 446, 456–458 (1970); Maryland v. Brown, 295 F.Supp. 63 (D.Md.1969). The Alaska Constitution contains no formal provision for a jury of the vicinage.

In Duncan v. Louisiana[10] the United States Supreme Court held the right to jury trial contained in the sixth amendment to be directly applicable to state prosecutions. There can be little room for doubt that this extension to the states of the sixth amendment right to jury trial necessarily comprehends the guarantee that juries shall be impartial.[11] We are concerned, in this appeal, with the construction and application of these constitutional assurances of jury impartiality as they relate to the process of selecting prospective jurors.

■ The United States Supreme Court has, on several occasions, confronted the problem of determining whether a given system of jury selection produced an impartial jury. The decisions of the Court indicate that a jury will be deemed impartial when the source from which it is drawn reasonably reflects a cross section of the population. In Smith v. Texas,[12] for example, the Court held:

> It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.

This sentiment was echoed by the Court in its decision in Glasser v. United States:[13]

> [O]ur democracy itself, requires that the jury be a 'body truly representative of the community', and not the organ of any special group or class.

In the decade following the decisions in *Smith* and *Glasser,* the Supreme Court acted twice to reverse cases in which it concluded that the juries had not been drawn from a fair cross section of the community. In Thiel v. Southern Pacific Company,[14] the Court upheld a challenge to the composition of a federal jury from which all daily wage earners had been excluded pursuant to a policy adopted by the federal district court. The Court held that exclusion of all daily wage earners was inconsistent with the notion of a jury representing a cross section of the community, and reversed on that basis. Ballard v. United States,[15] was decided shortly after *Thiel.* The Court in *Ballard* reversed convictions resulting from a trial in which women had been excluded from the jury panel. Again, the Court found that systematic exclusion of women effectively negated the possibility of a jury representing a fair cross section of the community. In both *Thiel* and *Ballard* the Court employed its power of supervision over the administration of justice in the federal system, and, consequently, in neither case was the constitutional issue reached. It is significant, however, that in both cases the Court relied on its prior rulings in *Smith* and *Glasser,* which plainly discussed the concept of a jury representative of a fair cross section of the community in constitutional terms.[16]

10. 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). *See also* Baker v. City of Fairbanks, 471 P.2d 386 (Alaska 1970).

11. As the United States Supreme Court held in Glasser v. United States, 315 U.S. 60, 85, 62 S.Ct. 457, 471, 86 L.Ed. 680, 707 (1942) (footnote omitted) :
Lest the right of trial by jury be nullified by the improper constitution of juries, the notion of what a proper jury is has become inextricably intertwined with the idea of jury trial. When the original Constitution provided only that 'The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; ' the people and their representatives, leaving nothing to chance, were quick to implement that guarantee by the adoption of

the Sixth Amendment which provides that the jury must be impartial.

12. 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84, 86 (1940).

13. 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680, 707 (1942). *See also* Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 97 L.Ed. 469, 497 (1952).

14. 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946).

15. 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946).

16. More recently, the Supreme Court has indicated, in dictum, that the standard of a jury representative of a fair cross section of the community may be applicable

This court has similarly espoused the notion that representation of a fair cross section of the community on the jury list is an essential prerequisite to an impartial jury under our Constitution. In Green v. State,[17] we indicated that a jury which was not selected from a fair cross section of the community would not, in a constitutional sense, be impartial. We stated that the right to a jury trial

> is a fundamental right, recognized as such throughout our nation by the constitutions of all of our states and our federal government.

> Not only is such a right recognized, but it has been protected against nullification by the improper constitution of juries. A jury under our constitution must be an 'impartial' one. This is an expression of the notion of what a proper jury is—a body truly representative of the community. Such a notion is in keeping with our basic, traditional concept of a democratic society and representative government.[18]

We further indicated in *Green* that to subject an individual to a trial before a jury which had not been selected in conformity with the constitutional mandate of impartiality would amount to a denial of due process:

> If it appeared that the jury selected for petitioners' trial would not be 'impartial' in the constitutional sense because not truly representative of the community where petitioners are to be tried, then petitioners could make a valid argument that they were not accorded due process of law. To require petitioners to be tried by such a jury would not be in accord with our traditional conception of substantial fairness and justice.

> The constitutional standard in jury selection will be met if prospective jurors are drawn from a fair cross section of the community.[19]

■■ The narrow issue with which we are presented in this case, then, is whether, in view of the 15-mile restriction on jury selection, Alvarado's jury panel was drawn from a fair cross section of the community. We recognize that the contours of a fair cross section of the community are elusive and, indeed, that they may not

---

to juries in state prosecutions. In Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469, 498 (1953) (emphasis supplied), the Court stated:

> Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, *so long as the source reasonably reflects a cross section of the population* * * *.

The Court's reliance on its own supervisory powers in Thiel v. Southern Pac. Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), and Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), is not inconsistent with recognition of the "fair cross section" standard as a constitutional requirement. Several cases have considered the requirement of a jury representative of a cross section of the community to be applicable to the states as a facet of due process. *See, e. g.,* Labat v. Bennett, 365 F.2d 698, 722–723 (5th Cir. 1966), cert. denied, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967) ; Bokulich v. Jury Comm'n, 298 F.Supp. 181 (N.D.Ala.1968), aff'd per curiam, 394 U.S. 97, 89 S.Ct. 767, 22 L.

Ed.2d 109 (1969) ; Allen v. State, 110 Ga.App. 56, 137 S.E.2d 711 (1964) ; Brewer v. State, 252 N.E.2d 429 (Ind. 1969) ; State v. Madison, 240 Md. 265, 213 A.2d 880 (1965) ; Schowgurow v. State, 240 Md. 121, 213 A.2d 475 (1965). *See also* United States v. Butera, 420 F.2d 564, 568 at n. 7 (1st Cir. 1970). *Contra,* Salisbury v. Grimes, 406 F.2d 50 (5th Cir. 1969).

17. 462 P.2d 994 (Alaska 1969).

18. *Id.* at 997 *(footnotes omitted). See also* our discussion of the cross section requirement in Crawford v. State, 408 P.2d 1002, 1009 (Alaska 1965), where we intimated that reversal would be appropriate in cases where the "jury had been selected in disregard of standards of jury selection reflected in our American tradition and democratic ideals of indictment and trial by jury."

19. 462 P.2d at 997 (footnote omitted). We have also expressed similar views in the context of a civil jury trial. *See* Bachner v. Pearson, 479 P.2d 319, 333–334 (Alaska 1970).

be susceptible of precise definition. However, under the circumstances of the present case we are compelled to find that Alvarado was not afforded an impartial jury as contemplated by the sixth amendment of the United States Constitution and by article I, section 11 of the Alaska Constitution. We further conclude that failure to provide Alvarado with an impartial jury constitutes a denial of his constitutional right to due process of law.[20]

The evidence in the record, summarized above, convincingly reveals the unique situation which prevails in the third judicial district and, indeed, throughout the State of Alaska. This evidence vividly portrays the enormous gulf which separates the mode of life of the typical Alaskan villager from the type of existence led by most residents of Anchorage and other cities of the state. The differences between a Native village and the City of Anchorage are neither simple nor superficial; they are not restricted to a single element such as occupation or income.[21] Rather, the lines of separation are profound and intersect areas including occupation, economy, domestic relations, politics, language, religion, race, cultural heritage, and geography.

Anchorage is a compact, self-contained, urban community, strongly influenced by the mainstream of the urban and suburban culture which dominates much of the United States. While it is fortunately spared many of the problems shared by larger cities in other states, in truth Anchorage is a city not unlike many other American cities. In stark contrast, Native villages enjoy almost none of the usual trappings of urban and suburban existence.[22] Employment in Native villages is normally sporadic; full-time jobs are the exception, not the rule. Villages participate only to a limited extent in the cash economy upon which the cities of Alaska are dependent. Residents of villages continue to depend to a significant extent on gathering activities for at least part of their subsistence. Vast sociological distinctions are also discernible. In Native villages such as Chignik there is normally exposure to two languages. Attitudes of Native villagers in such matters as family relations, sexual mores, and religion differ markedly from the attitudes shared by many city dwellers. Moreover, residents of Native villages partake in a cultural heritage which is distinct from that of most inhabitants of the city. Differences even exist in the area of politics; it is commonly observed that the characteristic voting pattern of Anchorage varies greatly from that of the outlying regions of the state.

But it is upon racial grounds that the gap between Native villages such as Chignik and urban areas such as Anchorage is the most easily visible. Racial composition is not a factor which can be separated or isolated from the other points which distinguish villages from cities like Anchorage; rather it is an integral component of those differences. This inter-relationship between race and other elements characterizing village life has been incisively

20. United States Const., amend. XIV, § 1 provides in part:
   [N]or shall any State deprive any person of life, liberty, or property, without due process of law;
   Alaska Const., art. I, § 7 provides in part:
   No person shall be deprived of life, liberty, or property, without due process of law.
   In reaching our conclusion on the basis of denial of the right to an impartial jury and of the right to due process of law, we need not insist upon a showing that Alvarado was a member of the group excluded from representation on his jury panel, or that he was prejudiced by the exclusion of that group. For, in the words of Ballard v. United States, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181, 186 (1946) (footnote omitted), "reversible error does not depend on a showing of prejudice in an individual case. The evil lies in the admitted exclusion of an eligible class or group in the community * *."

21. See, e. g., Thiel v. Southern Pac. Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946).

22. A definitive exposition of conditions prevailing in the Native villages of Alaska is presented in the recent publication of the Fed. Field Comm. for Dev. Planning in Alaska, Alaska Natives and the Land, 37–84 (October 1968).

noted by the Federal Field Committee for Development Planning in Alaska:

> About four-fifths of the more than one-quarter million people of Alaska are not Alaska Natives. Most of them, living in or near urban places, lead lives very much like those of other Americans. They are, by and large, regularly employed. Most families earn more than $10,000 per year, though a few earn less than $2,000. Virtually all adults have completed primary education and the median educational level is more than 12 years.

> The other one-fifth, who are Eskimos, Indians, and Aleuts, spring from cultures very different from those of other Alaskans or other Americans. Most of them live in widely scattered settlements across the half-million· square miles of Alaska. In an economy based importantly in a pattern of life of subsistence fishing and hunting, the large majority of these Alaskans are unemployed or only seasonally employed. Though some few of the families have incomes of $5,000 or more annually, most of them live in poverty. And, almost seven out of ten adults have less than an elementary school education (1960).

> Largely because they lack cash income and because the costs of purchased goods and services are high, most Natives live in small, dilapidated or substandard houses under unsanitary conditions. Partially as a result of these conditions, but also owing to unbalanced diets and other factors, they are more often victims of disease, and their life span is much shorter than that of other Alaskans.

> \*   \*   \*   \*   \*   \*

> Most Alaska Natives characterized by these circumstances are residents of places where the population is largely of Native origin—they are village Alaskans.[23]

It is undeniable that the remote Native villages of the third judicial district are vastly dissimilar from the metropolis of Anchorage. The gap stretching between these two distinct classes of community is of far greater magnitude than that which normally separates city from city or small town from city elsewhere in the United States. We are faced here with the order of differences which distinguishes one culture from another. The showing in the record persuasively establishes that it is the community of the Native village to which Alvarado is most closely tied and in which he is most comfortable. It is, fur· thermore, in this community that the crime in the present case was alleged to have been committed. Yet because Anchorage is geographically separated from all but one of the Native villages in the third judicial district, and because the system of jury selection employed in the present case restricted eligibility for jury service to residents of the area within a 15-mile radius of Anchorage, virtually all residents of Native villages were excluded from the jury panel.

Certainly the two cultures—the culture of the Native villages on the one hand and that of the City of Anchorage on the other—are not totally isolated from each other. Villages throughout Alaska, have, of course, felt the impact of rapidly developing urban places such as Anchorage. Conversely, Anchorage is a cosmopolitan center in which numerous Alaska Natives live and work. But while each community has had its influence upon the other, an essential cultural difference remains between them; and in all likelihood this difference will continue to exist in the future. We do not believe that the members of one of these two types of community can be substituted on the jury panel for members of the other without substantially impairing the democratic ideal inherent in the notion of an impartial jury as an institution

---

23. *Id.* at 3.

representing a fair cross section of the community.[24]

At the heart of the problem of determining whether a jury may be considered impartial lies the notion of the proper community from which the jury should be drawn. If we are to decide that the source from which jurors are drawn either does or does not represent a fair cross section of the community, then we must inquire into what may properly be deemed a community. We have, thus far in our discussion, chosen to emphasize the sharp differences which exist between the City of Anchorage and the numerous Alaska Native villages. Yet in a very real sense, the entire State of Alaska may be considered to be a single community. For the purpose of selecting prospective jurors, the legislature has designated Alaska's four judicial districts as outer community boundaries.[25] However, the notion of a proper community is a pliant one, capable to a large extent of accommodating the requirements of efficiency and fairness in the administration of justice.[26] Though the boundaries of our judicial districts may constitute the broadest permissible communities from which jurors may be drawn, judicial districts are not necessarily the only acceptable communities for the purpose of jury selection. Thus, we have previously upheld the practice of selecting jurors from more limited areas within our judicial districts.[27]

24. It is the state's theory that Alaska Natives within the 15-mile radius of Anchorage will adequately represent the interests of village Natives on jury panels. The state argues that while there is

> no evidence to indicate what percentage of those Natives living within a 15-mile radius of Anchorage have recently lived in a village * * * they share a common origin not remote in time. Recent census studies indicate that extensive migration to urban places is occurring.

However, this argument fails to present the whole picture. The following statement of the Fed.Field Comm. for Dev. Planning in Alaska, *supra* n. 22, at 7 (footnote omitted), is apposite:

> While migration to urban places in Alaska and to other states in occurring, villages are not vanishing from the scene today as is often assumed. There are today twelve fewer separate Native places (of 25 or more persons) than were indicated in the 1950 census, but more than 80 precent of the places continuing to exist are larger than they were seventeen years ago. And more than half of these are growing more rapidly than the approximate rate of net natural increase. The aggregate population of Native places today is a third larger than it was in 1950.

One further comment is appropriate at this point. In concluding that residents of Native villages are entitled to representation on jury panels, we in no way imply a view that all Native villages are alike. Certainly we are not insensitive to the fact that significant differences in language, race, and culture exist between Native villages in various parts of the state. Indeed, we recognize that there may frequently be important differences between the inhabitants of one village and those of the next. By our holding we mean only that, for the purpose of comparison with the mainstream urban society of a city such as Anchorage, Alaska Native villages, taken as a whole, share a common nexus.

25. It is manifest that the legislature intended our judicial districts to comprise communities from which juries could be selected. AS 09.20.050 provides in part:

> At such times as the presiding judge of the superior court in each judicial district may designate, but not less than once every two years, the clerk of the superior court in each judicial district shall prepare a list of the names of residents of the district who are qualified by law for jury service.

26. Of course, the legislature may choose to require selection of jurors from the entire judicial district in every case, thus precluding the use of any narrower area as a source for prospective jurors. For example, the federal Jury Selection and Service Act of 1968, 28 U.S.C.A. § 1861 et seq., compels the drawing of jurors from throughout judicial districts. *See also* McKusick & Boxer, Uniform Jury Selection and Service Act, 8 Harv. J.Legis. 280 (1971).

27. *See* West v. State, 409 P.2d 847 (Alaska 1966); Crawford v. State, 408 P.2d 1002 (Alaska 1965). For a similar case decided under Alaska territorial law, see Yoho v. United States, 14 Alaska 174, 202 F.2d 241 (9th Cir. 1953).

It is notable, however, that in our previous decisions we have dealt only with instances where the alleged offenses had occurred within the narrow area from which prospective jurors were selected. We deem this fact to be highly significant, because the traditional starting point for determining the community from which jurors are to be selected is the scene of the alleged offense.[28] Hence, we feel that in determining whether the source from which a given jury is selected represents a fair cross section of the community, we must adhere to a notion of community which at least encompasses the location of the alleged offense.[29] It is the community in which the crime was committed that the jury must represent.

Because the focus of the concept of community is on the place where the offense has allegedly been committed, any narrowing of the area from which prospective jurors are drawn will have no effect on the impartiality of jury panels, so long as the narrow area of selection continues to include the scene of the crime, and so long as it remains sufficiently broad to allow for the empanelment of a jury which is not prejudiced by knowledge of the events of the specific crime charged.[30] Where, on the other hand, prospective jurors are selected from an area which

28. The use of the scene of the crime as the significant factor in determining the location from which jurors were to be drawn is closely allied to the common-law vicinage requirement, and is traceable to the earliest function of juries. Juries in England were originally conceived as bodies of people who could judge the accused on the basis of personal knowledge of the acts charged. Jurors were thus expected to be acquainted with the facts surrounding the particular case. Obviously, then, summoning jurors from the immediate vicinity of the crime was a matter of practical necessity.

Events leading up to the American Revolution gave new impetus to the vicinage concept, and new importance to the scene of the crime as an indicator of the location from which the jury was to be drawn. In the years preceding the American Revolution, incidents of transportation to and trial in England of colonists became increasingly frequent. These incidents have been deemed to be among the major precipitating factors of the Revolution. Thus, for example, the Declaration of Independence condemned the King for "transporting us beyond seas to be tried for pretended offenses." It was the desire to prevent these abusive practices which led to the adoption of the sixth amendment's vicinage requirement, which compels selection of juries from the state and district of the crime. Many state constitutions retain vicinage language requiring selection of jurors from limited areas, such as counties, in which crimes are charged. For a general discussion of the historical development of the vicinage requirement see Blume, *supra* n. 9.

29. This does not mean that the source of prospective jurors must in all instances include residents of the place in which the crime was allegedly committed, for it is conceivable that the source of prospective jurors may exclude the scene of the alleged offense, yet still reasonably represent a cross section of the community which includes the scene of the offense. Thus, several decisions imply that selection of prospective jurors from a restricted area within a judicial district, even if the scene of the crime is omitted from that area, will be acceptable if there is no indication that the population of the restricted area differs significantly from the population of entire district. *See, e. g.,* United States v. Gottfried, 165 F.2d 360 (2d Cir.), cert. denied, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948); United States v. Brown, 281 F.Supp. 31 (E.D.La.1968).

30. Thus, there are numerous cases which uphold the use of juries drawn from areas narrower than the broadest area prescribed by legislation, but these cases deal with circumstances in which the scene of the alleged crime is included in the restricted area of selection. *See, e. g.,* Ruthenberg v. United States, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414 (1918); United States v. Titus, 210 F.2d 210, 212–213 (2d Cir. 1954), cert. denied, 350 U.S. 832, 76 S.Ct. 66, 100 L.Ed. 742 (1955); Yoho v. United States, 14 Alaska 174, 202 F.2d 241 (9th Cir. 1953); United States v. Wan Lee, 44 F. 707 (D. Wash.1890); State v. Henning, 83 Ohio App. 445, 78 N.E.2d 588, 590 (1948). Our decisions in West v. State, 409 P. 2d 847 (Alaska 1966), and Crawford v. State, 408 P.2d 1002 (Alaska 1965), may be placed in this category.

does not encompass the scene of the alleged crime, there will always be a danger that significant elements of the community in which the crime occurred will be excluded from representation on the jury panel, and that the panel will consequently fail to represent a fair cross section of the community. In such cases, care must be exercised to assure that exclusion does not actually occur.

In the present case the scene of the crime charged against Alvarado was the village of Chignik; thus, in determining whether Alvarado's jury was drawn from a source which represented a fair cross section of the community, we must define the term community to include Chignik. Several differing formulations of community might be proposed: in the narrowest sense, the village of Chignik might be considered an appropriate community; a broader possible community would be the election district in which Chignik is located; still broader would be the entire third judicial district. In short, a jury drawn from a source which reasonably reflects a fair cross section of any of these possible communities might properly be deemed constitutionally impartial.

We need not decide which of these alternative definitions of community would be preferable. It is sufficient for the purposes of this case to note that residents of Native villages would constitute a significant element in the population of any conceivable community which included the village of Chignik. Because the source from which Alvarado's jury was drawn—namely, the area within a 15-mile radius of Anchorage—excluded virtually all residents of Native villages in the third judicial district, we are constrained to find that the jury empanelled in this case could not have adequately represented a fair cross section of the community in which the crime occurred, and that it therefore cannot be deemed impartial.

The necessity for selection of juries from a source which truly represents a fair cross section of the community cannot be overemphasized. The jury is an essential institution in our democracy, and serves multifaceted purposes.[31] It is, of course, primarily charged with the task of finding the truth of the facts asserted.[32] Yet beyond its utility as a finder of fact, the jury fulfills other equally vital political and psychological purposes. In Green v. State,[33] we had occasion to note the jury's role as a safeguard against the possibility of governmental tyranny and oppression. We stated there:

> As a protection or barrier against the exercise of arbitrary power, the people of this state, in adopting our constitution, guaranteed to petitioners the right to be tried by "an impartial jury of twelve."

As an institution, the jury offers our citizens the opportunity to participate in the workings of our government, and serves to legitimize our system of justice in the eyes of both the public and the accused.

31. For illuminating commentary on various aspects of the jury function see Broeder, The Functions of the Jury—Facts or Fictions, 21 U.Chi.L.Rev. 386 (1954); Tucker, Racial Discrimination in Jury Selection in Virginia, 52 Va.L.Rev. 736, 742 (1966); Note, The Case for Black Juries, 79 Yale L.J. 531 (1970); Note, Trial by Jury in Criminal Cases, 69 Colum.L.Rev. 419 (1969).

32. As the Supreme Court stated recently in Williams v. Florida, 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446, 460 (1970):
> [T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.

33. 462 P.2d 994, 997 (Alaska 1969) (footnote omitted). See also our discussion of the jury's function in Baker v. City of Fairbanks, 471 P.2d 386 (Alaska 1970). For an interesting historical perspective of this aspect of the jury's role see Note, The Changing Role of the Jury in the 19th Century, 74 Yale L.J. 170 (1964).

The jury, like the right to vote, is fundamentally preservative of ideals which are essential to our democratic system. When the impartiality of jurors is neglected, "[t]he injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." [34] For this reason, we must be ever militant to protect the notion of our juries as bodies truly representative of the community. The admonition of the United States Supreme Court in Glasser v. United States,[35] must faithfully be heeded:

> Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted. That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may one by one lead to the irretrievable impairment of substantial liberties.

In the present case, Alvarado was not provided with a jury drawn from a source truly representative of a fair cross section of the community. If it was representative of anything, the jury panel summoned to hear Alvarado's case was representative only of the small community lying within 15 miles of Anchorage. It was not in this community that Alvarado lived, and it was not in this community that the crime charged against him was allegedly committed. Therefore, his conviction must be reversed.

By our holding, we do not signify that use of the Anchorage 15-mile jury selection limit for cases arising in Anchorage is improper, nor do we overrule our prior decisions in West v. State,[36] and Crawford v. State.[37] Our decision does not mean that citizens from the town or village in which a crime has occurred may never be excluded from representation on the jury panel. As we have already noted, under certain circumstances it may be permissible to exclude the area of the crime from the source of jury selection.[38] We further do not intend to hold that all differences among individuals, or that every conceivable group in the community, must be recognized for the purpose of representation on juries. Our ultimate objective is only that juries be selected at random from a source which reflects a fair cross section of the community in which the crime has allegedly occurred; if this goal is attained, the accused will truly have been judged by a jury of his peers.[39] What

---

34. Ballard v. United States, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181, 187 (1946).

35. 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680, 707 (1942).

36. 409 P.2d 847 (Alaska 1966).

37. 408 P.2d 1002 (Alaska 1965).

38. *See supra* n. 29. The point should be stressed that our holding does not mean that the place of the alleged offense cannot be excluded from the area of selection in cases where the circumstances of the individual case render it impossible to find suitable jurors at the location of the alleged crime. Thus, it is well established that the area surrounding the location of the crime may be excluded from the source of selection when it appears that an unbiased jury could not be drawn therefrom. *See, e. g.,* Connelly v. United States, 249 F.2d 576 (8th Cir. 1957), cert. denied, 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed.2d 716 (1958); Myers v. United States, 15 F.2d 977 (8th Cir. 1926); Spencer v. United States, 169 F. 562 (8th Cir. 1909); Maryland v. Brown, 295 F.Supp. 63 (D.Md.1969); Commonwealth v. Reilly, 324 Pa. 558, 188 A. 574 (1936); Newberry v. Commonwealth, 192 Va. 819, 66 S.E.2d 841 (1951).

39. Nearly a century ago, the United States Supreme Court held in Strauder v. West Virginia, 100 U.S. 303, 308, 25 L.Ed. 664, 666 (1880):

> The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates,

we do hold, then, is that an individual should not be forced, against his will, to stand trial before a jury which has been selected in such a manner as to exclude a significant element of the population of the community in which the crime was allegedly committed.

■ Because of the vast expanses of land which lie within the borders of our state, because of the variety of the cultural heritage of our citizens, and because of the relative sparseness of our population, the problem of selecting juries in Alaska is unique. There may be many defects in the present scheme of jury selection, but the formulation of an ideal system is a project to which an appellate decision is not suited. Such a task would undoubtedly be best left to legislative enactment or rule of court. However, a constitutionally acceptable method of selection is within the reach of this opinion. For cases arising from crimes allegedly committed within the various urban centers of Alaska, we think that maintenance of geographical limits currently in force will be acceptable, provided, of course, that selection within the given areas is not itself discriminatorily conducted.

■ As for cases arising outside the urban and predominately non-Native centers of Alaska, two acceptable and, we believe, feasible alternatives may be employed in selecting jurors. First, jurors may be selected from among residents of the entire judicial district in which the crime is alleged to have occurred. A second alternative, one which is perhaps at the same time more desirable and more workable than the first, would be selection of jurors from the senate election district in which the crime is alleged to have occurred.[40] Either of these alternatives would be calculated to produce jury panels satisfying the constitutional requirement of impartiality.

It is difficult to gauge the increase in expenditures which will be occasioned by the expansion of jury representation in the manner described above. No matter what the amount, however, we do not think that it would justify the perpetuation of a system which denies to a large segment of our citizens the opportunity to participate in our system of justice. The sentiments which we expressed in Baker v. City of Fairbanks[41] apply with equal force in the circumstances of the present appeal:

> If an individual right is vested by the Constitution, the overriding demands of governmental efficiency must be of a compelling nature and must be identifiable as flowing from some enumerated constitutional power. To allow expediency to be the basic principle would place the individual constitutional right in a secondary position, to be effectuated only if it accorded with expediency.
>
> This would negate our entire theory of constitutional government.

It is of paramount importance that the benefits conferred by the Constitutions of the United States and Alaska be extended

persons having the same legal status in society as that which he holds.

40. In connection with this second alternative, it is important to note the recent enactment into law of Ch. 126 SLA 1971 (May 10, 1971). This measure provides for commencement of all prosecutions in the judicial district in which crimes are alleged to have been committed, and requires that venue—that is to say the actual place of trial—in criminal cases be "in an election district within the judicial district at a location which would best serve the convenience of the parties and witnesses." In enacting this provision, the legislature made explicit the fact that its purpose was "to make the administration of justice more accessible to the people of rural areas of the state." While the statutory language is flexible, it may reasonably be anticipated that the overall effect of this legislation will be to require numerous trials within the election district in which a crime has been committed. The administrative and financial impact of selecting jurors from within the election district in which the crime occurred will be considerably diminished given the fact that trial will at any rate have to be held within the district.

41. 471 P.2d 386, 394 (Alaska 1970) (footnote omitted).

with an even hand to the people of our state. When a large segment of the population lives in towns and villages scattered throughout the reaches of the state, we cannot afford to succumb to the temptation of convenience by allowing the machinery of justice to become inflexibly entrenched within the enclaves of our major cities. Instead we must tailor our system of justice to meet the needs of the people. It is our judicial system which must take the initiative to assure compliance with the mandates of the Constitution; we cannot simply neglect or ignore communities of individuals located in remote areas of the state. Justice must be made available to all of the people of Alaska.

This case is reversed and remanded to the superior court for a new trial to be held in conformity with this opinion.