**Thomas WARD, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–6842.

Court of Appeals of Alaska.

Feb. 25, 2000.

Susan Downie, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

James L. Hanley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

Thomas Ward appeals his conviction for third-degree assault.[1] He claims that the superior court erred by selecting a jury in Fairbanks rather than renewing its unsuccessful efforts to select a jury in Fort Yukon. Ward also claims that he acted in self-defense and that the court erred by not instructing the jury on that defense. We reject both of Ward's claims and affirm.

### Facts and proceedings

On October 2, 1996, in Fort Yukon, Thomas Ward went to James Ward's house. James Ward is Ward's father. Ward's former girlfriend, Lori James, was there. All three had been drinking. Within a short time, Ward and his father started arguing. James Ward told his son to leave. Ward did not leave. James Ward picked up a rifle. Ward took the rifle away and threw it down. Ward started backing out of the house. James Ward picked up an axe. As they moved outside, Ward struggled with his fa-

---

1. AS 11.41.220(a)(1).

ther to get control of the axe. Lori James tried to intervene. Ward hit her in the head with the axe and caused a cut that required five to six stitches. For this conduct, the grand jury indicted Ward for one count of first-degree assault for "recklessly caus[ing] serious physical injury to Lori James."[2]

Jury selection for Ward's trial began in Fort Yukon. Following normal procedures, the court summoned one hundred sixty-seven people to report for jury selection. During the first day of jury selection, seventy-three prospective jurors were excused for cause. The parties exercised eight peremptory challenges, one from Ward, and the rest from the State. Some prospective jurors were excused without *voir dire* because they were relatives of the defendant or the victim, had medical excuses, or were not qualified. Ward did not object to the court excusing these jurors. Eleven jurors had been excused for cause by the end of the first day. There were no other prospective jurors in court.

At this point, the court and the parties examined the list of prospective jurors. Of the one hundred sixty-seven prospective jurors summoned for jury selection, the court could find only sixteen people on the list who had not been excused during *voir dire* or otherwise accounted for. After a discussion with the parties, the court decided to broadcast a message on the local radio station the next morning asking those sixteen prospective jurors, who had not reported on the first day, to report for jury selection the next morning.

Out of the sixteen, five reported. One other prospective juror who was thought to be out of town also appeared. The court continued *voir dire*. The court excused five of those six jurors for cause. The State exercised a peremptory challenge to excuse the sixth. Again, there were no other prospective jurors in the court.

The State suggested that the court return to Fairbanks and select a jury there. Ward recommended further attempts to contact the eleven prospective jurors unaccounted for, who did not respond to their summons or to the radio messages. Neither Ward nor the State suggested supplementing the Fort Yukon jurors already passed for cause with jurors from the Fairbanks area. Nor did either party suggest obtaining another list of potential jurors from court administration to contact for potential service on this case.

Judge Beistline decided not to telephone or otherwise attempt to contact the potential jurors that did not respond to the summons or the radio messages. Judge Beistline elected to release the Fort Yukon jurors and return the case to Fairbanks for jury selection.

> *The Court:* I think that we have seen a cross section of the community and there is a significant concern even with regard to members—other people that we would get. It appears that there are concerns about knowledge about the incident as well as relations to the various parties. So at this point I think we've gone as far as we're required to go and even farther in attempting to obtain a jury and I frankly think that we're at the point now where any jury that [we] even obtained would be affected by the word of mouth in the community[.] ... And so I'm going to conclude that we can't get a fair trial at this time in Fort Yukon, and we'll remand the matter back to Fairbanks[.]

In Fairbanks, the case was reassigned to Superior Court Judge Niesje J. Steinkruger for trial. The parties selected a jury and began trial. However, a mistrial was declared at Ward's request because of a discovery violation. The case was then reassigned to Superior Court Judge Charles R. Pengilly. A jury was selected and the case was tried.

At trial, testimony was given by Lori James, James Ward, a Fort Yukon police officer, a physician's assistant who treated Lori James, and Ward. The jury acquitted Ward of first-degree assault, but convicted him of the lesser-included offense of third-degree assault (recklessly causing physical injury to Lori James by means of a dangerous instrument).

---

**2.** AS 11.41.200(a)(1).

*Discussion*

*Change of venue to Fairbanks for jury selection*

■ Ward argues that Judge Beistline committed reversible error by ending jury selection in Fort Yukon. He bases his argument on *Alvarado v. State.*[3] In *Alvarado,* the supreme court held that Alvarado was not afforded an impartial jury because the jury selection practices in his trial did not provide a pool that reflected a fair cross-section of his community. Alvarado had significant ties to the community of Chignik. His case was tried in Anchorage where jurors were summoned from an area within fifteen miles of Anchorage. Alvarado showed that this practice had the effect of virtually excluding all residents of Native villages. The supreme court held that the practice ensured that the prospective panel would not adequately represent a fair cross section of the community where Alvarado committed the offense and, thus, was a violation of Alvarado's constitutional right to an impartial jury under Article 1, Section 11 of the Alaska Constitution.[4]

Under *Erick v. State,*[5] if the State seeks a change of venue, the State has the burden to show that it was not reasonable to obtain a jury from the trial site where the offense allegedly occurred, as required by *Alvarado.*[6] Like Ward's case, jury selection for Erick's case began in Fort Yukon. When Erick's jury selection started, forty-nine potential jurors showed up. When it became apparent that there would not be enough jurors to select an entire jury, the superior court elected to supplement the panel by recessing the trial for a week and notifying other jurors, who were scheduled to appear the next day for other trials, to appear the following week for Erick's jury. No more than eight villagers showed up on the following day. Those that did appear were personally summoned for the continuation of Erick's jury selection. The remaining twelve from that second group that did not show up were mailed notices to appear the following week for Erick's continued jury selection.[7]

When Erick's trial resumed, only five or six villagers showed up. Thus, there was a potential maximum of only fifty-five jurors from which to select a jury in Erick's case. Significant in this court's analysis of Erick's case was the trial court's ignorance of the potential availability of more names from which to call potential jurors. Although the trial judge in Erick's case recognized the need to call additional jurors, apparently there was a mistaken belief that the only potential jurors available were the ones that appeared the first day of jury selection and those villagers scheduled to appear the day after Erick's jury selection began. In fact, substantial additional names could have been obtained with little effort or delay.[8]

Here, the court did not consider calling additional jurors from another list, nor did Ward ask the court to take that action. Fort Yukon is a small community where, as the record of this jury selection shows, personal and family relationships and local knowledge of an alleged crime can overshadow jury selection. Apparently, the court anticipated this potential difficulty in Ward's case because a panel substantially larger than that summoned in Erick's case was called for Ward's trial. In fact, more people were excused for cause during Ward's jury selection than ever appeared for selection in Erick's case.

Over one hundred sixty potential jurors were summoned for Ward's case. Of those called, only eleven were not accounted for by the time the court had exhausted all the potential jurors. A review of the *voir dire* in Ward's case during the court's two-day attempt to seat a jury indicates the problems that existed for this jury selection in Fort Yukon. The most common disqualifying reason for the overwhelming majority of those excused from jury service was that the potential juror was related to Ward, or to

---

3.   486 P.2d 891 (Alaska 1971).

4.   *Id.* at 898–901.

5.   642 P.2d 821 (Alaska App.1982).

6.   *Id.* at 824.

7.   *Id.* at 822–23.

8.   *Id.* at 823–25.

James, or to both. Generally, Ward's relatives expressed a bias in favor of Ward often stating that they could not convict Ward no matter what the evidence showed. James's relatives tended to favor conviction. The prospective jurors who were related to both, and who were excused because they said they could not be fair, split both ways. As one potential juror testified about Fort Yukon during *voir dire*, "[i]t's one big family."

Many who were excused were close and life-long friends with Ward or his father and expressed an unwillingness to consider the evidence. Some expressed bias because Ward's case alleged violence against a woman. Others had decided what position they would take on the case based on what they had heard about the case before trial. Some jurors, not excused for cause, expressed reservation or alignment. For instance, one juror said: "I really don't know that I'll be fair." Another stated: "I think [Ward] is a pretty nice guy. I don't think he [would do] something like this."

█ Generally, criminal trials should be held in the same location as the alleged offense. Nonetheless, the trial court has discretion to change venue when necessary to ensure a fair trial.[9] Although it might have been possible in Ward's case to locate additional prospective jurors to complete jury selection, the process undertaken revealed widespread relationships, both familial and personal, between the prospective jurors and the participants in the alleged assault. The process also showed that the jury pool had extensive knowledge of the incident itself.

Judge Beistline expressed his concern that other potential jurors from the area would possess the same characteristics already revealed during jury selection—knowledge about the incident, and personal or family relationships with Ward or James. As our supreme court noted in *Mallott v. State*,[10] *voir dire* "is not an infallible Geiger counter of juror prejudice" because latent bias can

remain unexposed in the face of thorough examination. A significant factor in *Mallott* was the media attention that exposed potential jurors to facts of the case.[11] While there is no issue of media attention raised in this case, *voir dire* showed pervasive local knowledge of and opinions about this case and its participants. In *Oxereok v. State*, the supreme court again recognized the danger of latent bias in a jury panel when *voir dire* exposed the presence of close relationships between the prospective jurors and the participants in the case, even though many of the members of the panel that were seated in the case did not affirmatively express any bias.[12]

Judge Beistline's dual concerns following the two-day *voir dire* (that prospective jurors demonstrated knowledge of the case and that prospective panel members had relationships with Ward, his father, or James) mirrored the concerns discussed in both *Mallott* and *Oxereok*.

Chief Judge Coats faults the superior court for not suggesting that Ward proceed with a jury of less than twelve in Fort Yukon, or supplementing the jury with jurors from Fairbanks. Both of these potential options were mentioned in *Erick*.[13] Erick stipulated to proceed with less than twelve jurors but reserved his right to appeal the jury selection issues.[14] There is nothing in this record that suggests that Ward would have agreed to proceed with less than twelve jurors and waive any issues regarding jury selection. And when Judge Beistline discussed what to do about jury selection when the panel had been exhausted the second day, Ward did not suggest any other solution other than trying yet another time to contact the remaining panel members who did not respond either to the summons for jury duty or the radio messages broadcast by the court.

From our review of the record, we conclude that the superior court undertook rea-

---

9. *See Oxereok v. State*, 611 P.2d 913, 919 (Alaska 1980); *Mallott v. State*, 608 P.2d 737, 746–48 (Alaska 1980).

10. *Mallott*, 608 P.2d at 748.

11. *Id.* at 747.

12. *Oxereok*, 611 P.2d at 918–22.

13. *Erick*, 642 P.2d at 826–27.

14. *Id.* at 827 n. 11.

sonable efforts to obtain a jury in Fort Yukon. We conclude it was not an abuse of discretion for Judge Beistline to decide to stop jury selection in Fort Yukon because of the difficulty that the court experienced in seating jurors over the two-day effort, that was caused by local knowledge among the jurors and widespread disqualifying relationships between the prospective jurors and the participants in the alleged crime.

*Jury instruction issues*

■ Next, Ward maintains that the superior court should have provided the jury with his proposed instructions on "transferred intent" and self-defense. Ward testified that Lori James was injured while he and his father struggled for control of the axe and that he never had exclusive control of the axe.

In contrast, Lori James testified that she followed the two outside the house and that she pushed Ward away from his father after his father fell down. Ward's father got up and headed inside the house. Ward asked James whose side she was on. Before she could answer, she saw the axe coming towards her.

Ward proposed pattern jury instructions on self-defense and an additional instruction on "transferred intent." The proposed transferred intent instruction read as follows:

The doctrine of transferred intent may apply in this case. The doctrine of transferred intent provides that where a defendant's action is justified by the doctrine of self defense, the doctrine of self defense also protects the defendant from the inadvertent injury of an innocent bystander.

Therefore, unless the state has proved beyond a reasonable doubt that the defendant did not act in self defense, you shall find the defendant not guilty, *so long as the injury to Lori James was inadvertent rather than reckless,* and occurred at such time as the defendant was actually acting in self defense. (Emphasis added.)

The court considered Ward's proposed instructions after the close of evidence. Judge

Pengilly asked Ward why his proposed instructions were warranted. Ward stated, in part, as follows:

*Defense Attorney:* If he's using justified force in defending himself from his father and she gets hurt while he's using justified force then under transferred intent he's not guilty as to his dad and as to her.

Judge Pengilly observed that the State had to prove that Ward's conduct was unjustified.

*The Court:* If [Ward is] guilty of this offense he has to have—been aware of and consciously disregarded a substantial and unjustifiable risk that Lori James was going to be hurt. If he's struggling for possession of the axe from his father and Lori James is hurt in the course of that struggle, I mean doesn't the definition of reckless give you everything you want?

Ward's proposed instruction itself permitted Ward's conviction if James was injured by Ward's reckless conduct, by stating that Ward should be found not guilty "so long as the injury to Lori James was inadvertent rather than reckless." This was the same burden that the State had to meet for both first-degree and the lesser-included offense of third-degree assault. For each of those crimes, the State had to prove that Ward acted recklessly. That is, the State had to show that Ward was "aware of and consciously disregard[ed] a substantial and unjustifiable risk that the result"—that James would be struck and injured—would occur.[15]

We agree with Judge Pengilly's analysis that Ward's requested instructions were superfluous. As Judge Pengilly instructed the jury, the State had to prove that Ward recklessly injured James. Under Ward's proposed instructions, the jury could convict Ward if the State proved that Ward recklessly injured James, the same burden the State had to meet to convict Ward under the court's instructions. We conclude that Judge Pengilly did not abuse his discretion when he declined to give Ward's proposed instructions.[16]

---

**15.** AS 11.81.900(a)(3).

**16.** *See Stoneking v. State,* 800 P.2d 949, 950 (Alaska App.1990).

*Conclusion*

The judgment of the superior court is AFFIRMED.

MANNHEIMER, Judge, concurring.

I agree with Judge Stewart's resolution of this case. I write separately to explain more fully why Ward was not entitled to a jury instruction on "transferred intent".

The common-law doctrine of transferred intent was, in effect, an addendum to the definition of murder. If a defendant, acting with malice aforethought, engaged in conduct intended to bring about the death of one person, and in so doing the defendant accidentally caused the death of another, the defendant would be guilty of murdering this unintended victim:

> [As] was stated by Lord Hale, and repeated in substance by Blackstone, ... "if A by malice aforethought strikes at **B** and missing him strikes **C** whereof he dies, tho he never bore any malice to **C** yet it is murder, and the law transfers the malice to the party slain."

R. Perkins & R. Boyce, *Criminal Law* (3rd edition 1982), p. 922.

Hale and Blackstone are among the luminaries of the common law. But as *Perkins & Boyce* points out, it is "a misleading half-truth" to say that the defendant's malice was "transferred" to the unintended victim.[1] Rather, the defendant is chargeable with murder because (1) common-law murder was defined as the killing of any person with malice aforethought, and (2) "malice aforethought" was defined as an intent to kill *anyone* (not necessarily the eventual victim) when the killing was neither mitigated, justified, nor excused.[2]

Alaska's modern-day definition of first-degree murder statute incorporates this same common-law concept; an intent to kill *anyone* suffices to establish the *mens rea* of the crime. Under AS 11.41.100(a)(1)(A), a defendant commits first-degree murder if, "with intent to cause the death of another person, the [defendant] causes the death of any person". Thus, it is misleading to speak in these circumstances of the defendant's "transferred" intent to kill.

Moreover, as explained in *Perkins & Boyce*, the misleading nature of this description is revealed more fully when a defendant seeks the benefit of a "transferred" *innocent* intent.

> For example, **B** might [be] making a murderous assault upon **A** under such circumstances that **A** was privileged to kill **B** in the lawful defense of [his] life.... If, under those circumstances, **A** should shoot at **B** in the proper and prudent exercise of his privilege of self-defense, and should happen unexpectedly ... to cause the death of **C**, [then] **A** should be free from criminal guilt.
>
> . . .
>
> [But this] hypothetical situation ... supposes not only the privilege to direct deadly force against **B** in the defense of **A**'s life, but also the proper and prudent exercise of this privilege. If ... [**A**] exercised this privilege so imprudently and improperly as to constitute a criminally-negligent disregard of the life of the innocent bystander, **C**, [then] the killing of **C** would be manslaughter.

*Perkins & Boyce*, p. 922–23.

In other words, even though a person is under attack and is properly defending himself, he continues to owe a duty of care to bystanders. A person has no "transferred" privilege to attack and injure innocent third parties. Obviously, when a judge or jury assesses the reasonableness of the person's actions, the judge or jury must take into account the fact that the person was justifiably defending himself from attack. But if, even given this extenuating circumstance, a defendant's actions are still reckless or criminally negligent, then the defendant can be held criminally responsible for the death or injury of a bystander.

In Ward's case, that bystander was Lori James. Because Ward was charged with recklessly inflicting injury on James, his duty of care toward James was specified in AS

---

1. *Perkins & Boyce*, p. 921.

2. *See id.*

11.81.900(a)(3), the statutory definition of "recklessly":

[A] person acts "recklessly" with respect to a result [here, injury to another person] ... when the person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur ...; the risk must be of such a nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation[.]

If the jury believed that Ward was lawfully defending himself from his father, then this fact would obviously be crucial to any assessment of whether Ward's conduct with the axe created an "unjustifiable risk" of harm to James, and whether Ward's disregard of this potential danger to James constituted a "gross deviation from the standard of conduct that a reasonable person would observe in the situation". But if Ward's conduct did deviate to this degree from what society reasonably would expect under the circumstances, then he violated his duty of care toward James and he could properly be convicted of assaulting her.

Indeed, Ward's own proposed instruction on "transferred intent" conceded as much. The proposed instruction would have instructed the jury that Ward could be convicted of assaulting James if the injury to James was "reckless" rather than "inadvertent".

This principle having been conceded, there was little point in confusing the jury's deliberations with notions of "transferred intent". The true question—under both the actual jury instructions and Ward's proposed instruction—was whether Ward acted "recklessly" with regard to the possibility that his conduct would cause injury to James. Because the court's jury instructions fully and properly addressed this question, the trial judge could lawfully decline to give Ward's "transferred intent" instruction.

COATS, Chief Judge, dissenting.

In my view, this court's decision conflicts with the supreme court's position in Alvarado v. State,[1] which was decided nearly 30 years ago. In Alvarado, the supreme court condemned the practice of taking a defendant from a small rural community where his crime allegedly occurred and moving him to a large city and selecting a jury which represented an urban population rather than representing a fair cross section of the rural community where the crime was committed. We summarized the Alvarado case in Erick v. State as follows:

In Alvarado, a native defendant who was a resident of Chignik was charged with a rape allegedly committed in Chignik. He was tried over his objections in Anchorage by a jury which was selected from within 15 miles of Anchorage. In reversing Alvarado's conviction, the court emphasized the difference between Chignik, a remote native village approximately 450 miles from Anchorage, and the city of Anchorage. The court held that Alvarado was not provided with an impartial jury. The court said, "[W]e ... hold ... that an individual should not be forced, against his will, to stand trial before a jury which has been selected in such a manner as to exclude a significant element of the population of the community in which the crime was allegedly committed." [2]

In Alvarado, the supreme court recognized that carrying out its decision could entail considerable expense and inconvenience. But the supreme court concluded that the importance of the right to be tried by a jury which was representative of the place where the alleged crime occurred was of paramount importance:

It is of paramount importance that the benefits conferred by the Constitutions of the United States and Alaska be extended with an even hand to the people of our state. When a large segment of the population lives in towns and villages scattered throughout the regions of the state, we cannot afford to succumb to the temptation of convenience by allowing the machinery of justice to become inflexibly entrenched within the enclaves of our major cities.

1.  486 P.2d 891 (Alaska 1971).

2.  642 P.2d 821, 823–24 (Alaska App.1982) (quoting Alvarado, 486 P.2d at 905) (footnote omitted).

Instead we must tailor our system of justice to meet the needs of the people. It is our judicial system which must take the initiative to assure compliance with the mandates of the constitution; we cannot simply neglect or ignore communities of individuals located in remote areas of the state. Justice must be made available to all of the people of Alaska.[3]

In *Erick*, we specifically recognized the difficulties of selecting a jury in Fort Yukon but recognized that the *Alvarado* decision required courts to overcome these difficulties in order to make justice available to all the people in Alaska:

We appreciate the difficulties of obtaining a jury in communities such as Fort Yukon, where the record indicates that potential jurors are frequently related to or friends of parties, and where many of the potential jurors will have information about the case which disqualifies them as jurors. We also appreciate that there are frequently severe problems of communication, transportation, and availability of suitable facilities which make it difficult to hold a jury trial in such an area. The record shows that all of these problems were present in Erick's case. However, these problems are typical of the problems which result from the attempts of the court system to comply with the mandates of *Alvarado*, that "[j]ustice must be available to all of the people of Alaska."[4]

In *Erick*, we concluded that the state had the burden to show that it was not reasonable to obtain a jury from the area that had been selected for trial.

We believe that the policies of *Alvarado* dictate that we place the burden upon the state to show that it was not reasonable to obtain a jury of twelve in the Fort Yukon area once that area had been selected as the site for the trial.[5]

In *Erick*, we concluded that the record did not demonstrate that the state had met the burden of showing that it was not reasonable to obtain a jury of twelve from the Fort Yukon area. We relied on the fact that the trial court was apparently unaware that it could have obtained the names of many more potential jurors on short notice through a master jury list.[6] We noted that, had the court been aware of the names of more jurors, it could have telephoned perspective jurors from the list,[7] an emergency method of contacting jurors which the supreme court approved in *Calantas v. State*.[8] In *Erick*, although we concluded that the trial court had not made reasonable efforts to obtain a jury in Fort Yukon, we noted that the trial court gave the defendant the option to have his case tried by seven jurors empaneled in Fort Yukon or, to have his case tried in Fairbanks before those seven jurors, supplemented by additional jurors selected in Fairbanks.[9] We indicated that if the court had made reasonable efforts to obtain a jury in Fort Yukon and failed, that we would have upheld the court's ruling forcing Erick to elect between being tried by these seven jurors in Fort Yukon or having the jury pool supplemented by jurors from Fairbanks:

Assuming reasonable efforts were made to select a jury for Erick and those efforts failed, we do not believe that the trial court would be precluded from requiring Erick to choose between a trial in front of seven jurors selected from Fort Yukon or having the seven Fort Yukon jurors supplemented from Fairbanks.[10]

Against this legal background, it appears to me that the manner in which Ward's jury was selected violated his right to an impartial jury as set out in the *Alvarado* case. Ward was a Fort Yukon resident. The incident which led to the charges against Ward occurred in Fort Yukon. Yet the court forced Ward to try his case in Fairbanks before an

---

3. *Alvarado*, 486 P.2d at 905–6.

4. *Erick*, 642 P.2d at 824 (*quoting Alvarado*, 486 P.2d at 906).

5. *Erick*, 642 P.2d at 824.

6. *Id.* at 826.

7. *Id.*

8. 599 P.2d 147, 149–50 (Alaska 1979).

9. *Erick*, 642 P.2d at 823.

10. *Id.* at 827 n. 11.

urban jury, rather than in Fort Yukon before a jury representative of that area.

It is clear from the record that the state wanted to try the case in Fairbanks. The state opposed trying the case in Fort Yukon in the first place, opposed most of the court's efforts to supplement the jury, made frequent motions during jury selection to move the trial to Fairbanks and exercised essentially all of its peremptory challenges. By contrast, Ward clearly wanted the case tried in Fort Yukon. Ward constantly insisted on being tried in Fort Yukon, kept asking the court to take action to supplement the jury pool, and exercised few peremptory challenges. As a result of the state's effort, Ward was "forced, against his will, to stand trial before a jury which had been selected in such a manner as to exclude a significant element of the population of the community in which the crime was allegedly committed." [11]

In the first place, I have some question about whether the court used reasonable efforts to obtain all the jurors which it could have from Fort Yukon. The defendant asked the court to attempt to supplement the jury panel by having the court clerk telephone potential jurors. The court rejected his suggestion, finding that telephoning jurors was not a sufficiently random method to obtain jurors. But the supreme court specifically approved this method of bringing in supplemental jurors in *Calantas* [12] and we have relied on *Calantas* in suggesting this method of obtaining emergency jurors in *Erick*. [13] The record in the present case shows that, after the state had exercised its challenges for cause and peremptory challenges, that approximately ten jurors remained. Ward clearly was satisfied with these jurors. In light of the fact that the parties were close to selecting a jury in Fort Yukon, Ward's contention that the court system did not exhaust all reasonable efforts to obtain a jury in Fort Yukon has merit in light of the importance of the right set out in *Alvarado*.

Certainly the trial court did make a substantial effort to obtain a jury in Fort Yukon.

But even if I assume that the court's efforts were reasonable, I fail to see why the trial court did not follow the procedure which we approved in *Erick:* to offer Ward the option of being tried by a jury of less than twelve selected from Fort Yukon or having those jurors supplemented with jurors from Fairbanks. This would have allowed Ward to have his trial in front of jurors which were representative of the community where the incident occurred. The record before us shows no justification for having Ward tried by a jury selected entirely from an urban area.

I would accordingly reverse Ward's conviction.

---

**11.** *Alvarado,* 486 P.2d at 905.

