NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

# IN THE COURT OF APPEALS OF THE STATE OF ALASKA

JAMES E. BARBER,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-11401
Trial Court No. 1SI-10-446 CR

O P I N I O N

No. 2528 — December 16, 2016

Appeal from the Superior Court, First Judicial District, Sitka, David V. George, Judge.

Appearances: Douglas Miller, Law Office of Douglas S. Miller, Anchorage, and James E. Barber, *in propria persona*, Wasilla, for the Appellant. Timothy W. Terrell, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

Judge MANNHEIMER.

In December 2010, James E. Barber was living in Sitka at the home of a friend. On the evening of December 20th, three men wearing ski masks entered the

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

home, beat Barber with a baseball bat, and shot his friend's adult son, Matthew Hornaman, in the arm.

The three assailants — Chris Bettencourt, his son Jeff Bettencourt, and their friend Lance Smith — then left the home, got into the Bettencourts' truck, and began to drive away. Barber went to his bedroom, grabbed a .44 revolver, and ran after them. As the Bettencourts were backing up and turning around (to maneuver down the long driveway), Barber fired five shots at them. Several bullets struck the Bettencourts' truck, but the Bettencourts and Smith were uninjured, and they made their escape — although they were arrested at their residence several hours later.

Barber had a prior felony conviction, so it was illegal for him to possess a revolver, or even to live in a residence where he knew a concealable firearm was kept. *See* AS 11.61.200(a)(1) and (a)(10). To try to forestall any trouble, Barber dropped the revolver into a neighbor's hot tub. He later visited Matthew Hornaman in the hospital (where Hornaman was recovering from surgery), and he asked Hornaman not to tell the police that Barber had fired shots at the Bettencourts and Smith.

(Despite Barber's request, Hornaman informed the police that Barber had shot at the Bettencourts and Smith.)

Based on these events, the Bettencourts and Smith were prosecuted for assault. Barber was also prosecuted separately for several offenses: second-degree weapons misconduct (for discharging a firearm at or in the direction of the nearby dwellings), third-degree weapons misconduct (for residing in a dwelling with knowledge that a concealable firearm was kept there), witness tampering (for asking Hornaman not to tell the authorities anything about Barber's use of the revolver), and evidence

tampering (for hiding the revolver in the hot tub). [1] Barber was ultimately convicted of all four of these crimes.

Barber now appeals, raising several claims. For the reasons explained in this opinion, we reverse Barber's conviction for witness tampering, and we also direct the superior court to reconsider various aspects of Barber's sentence. In all other respects, however, we affirm the judgement of the superior court.

*Barber's claim that the police illegally seized his mobile phone*

While the police were investigating the events we have just described, a police detective interviewed Jeff Bettencourt's girlfriend, Tehsa Grutter. Grutter showed the detective a text message she had received from Barber, in which Barber bragged about having shot at the Bettencourts.

Later, this same police detective encountered Barber at the courthouse, where both men had been subpoenaed to testify before the grand jury that was considering the charges against the Bettencourts and Smith. When the detective finished testifying, he came out and saw Barber waiting to testify. The detective decided to arrest Barber because he suspected that Barber had his mobile phone in his possession, and that Barber's phone might still contain the incriminatory text message that Grutter had shown him. Barber was arrested without incident, and his phone was seized incident to that arrest. The police later obtained a search warrant for the phone.

After Barber was indicted, he asked the superior court to suppress all of the evidence derived from the seizure and ensuing search of his mobile phone. The superior

---

[1]   AS 11.61.195(a)(3)(B), AS 11.61.200(a)(10), AS 11.56.540(a)(1), and AS 11.56.-610(a)(1), respectively.

court initially granted this suppression motion, ruling that the State had failed to establish that there was probable cause for Barber's arrest.

The State then sought reconsideration of the court's ruling. The State argued that Barber's motion had not challenged the existence of probable cause, but instead whether the seizure of the phone met the other requirements for a search incident to arrest. The State also asserted that, if given the proper opportunity, the State could establish that the record was "replete with probable cause" to believe that Barber had committed crimes for which he could be arrested.

The superior court agreed that, given the way Barber's suppression motion had been framed and litigated, the State had not been on notice that it was required to affirmatively prove that there had been probable cause for Barber's arrest. The court therefore granted the State's motion for reconsideration and held a supplemental evidentiary hearing to address the issue of probable cause.

Based on the evidence adduced at the supplemental hearing, the superior court concluded that the detective had probable cause to arrest Barber for second- and third-degree weapons misconduct, and that the detective acted properly when he seized the phone and then applied for a search warrant. The court therefore reversed its earlier ruling and denied Barber's suppression motion.

On appeal, Barber argues that the superior court abused its discretion when it agreed to reconsider its initial ruling.

As we have explained, the superior court granted reconsideration because it concluded that the prosecutor did not have fair notice that the State would have to litigate the existence of probable cause for Barber's arrest. Barber offers various reasons for questioning the superior court's conclusion that the State lacked fair notice, but these reasons hinge on interpreting the surrounding facts in the light most favorable to Barber's attack on the court's ruling.

The question is whether the superior court was clearly erroneous when the court concluded that the prosecutor had been misled regarding the issues to be litigated at the initial evidentiary hearing. When we review a lower court's finding under the "clearly erroneous" standard, we must view the evidence in the light most favorable to the lower court's finding. [2] Viewing the record in that light, we conclude that Barber has failed to show that the superior court was clearly erroneous when the court concluded that, at the initial evidentiary hearing, the prosecutor lacked fair notice that the State would be expected to affirmatively establish that there was probable cause for Barber's arrest.

Barber also argues that even if the superior court was justified in concluding that the State lacked fair notice, this was not a proper ground for granting reconsideration.

Barber notes that Criminal Rule 42(k)(1) — the rule that lists the potential grounds for seeking reconsideration — does not expressly list "lack of fair notice regarding the issues to be litigated" among the grounds for asking a court to reconsider an earlier ruling. Because Rule 42(k)(1) does not expressly include "lack of fair notice" as a reason for seeking reconsideration, Barber argues that the superior court abused its discretion when it granted reconsideration on this ground.

We reject Barber's contention that Criminal Rule 42(k)(1) defines the outer boundaries of a court's authority to reconsider an earlier ruling. Here, the court found that the State had been misled regarding the issues to be litigated in connection with Barber's suppression motion. (Indeed, the court conceded that its own remarks during the initial evidentiary hearing might have misled the prosecutor.)

---

[2]  *Pister v. Alaska Dept. of Revenue*, 354 P.3d 357, 362 (Alaska 2015); *Forster v. State*, 236 P.3d 1157,1161-62 (Alaska App. 2010).

Criminal Rule 42(k)(1) may not list this situation as a ground for seeking reconsideration, but Criminal Rule 53 authorizes a court to relax or dispense with a rule in situations "where it [is] manifest ... that a strict adherence to [the rule] will work injustice". Given the circumstances here, the superior court had the authority to grant the State's motion for reconsideration and to hold a supplemental hearing on the question of whether there was probable cause for Barber's arrest.

Barber also challenges the superior court's ultimate decision on reconsideration — *i.e.*, the court's revised conclusion that Barber's arrest was lawful. Barber contends that even though the detective had probable cause to arrest him for felony weapons misconduct, it was nevertheless improper for the detective to make the arrest at that time, because the detective's main reason for conducting the arrest at that time was to obtain possession of Barber's mobile phone.

But as this Court explained in *Nease v. State*, 105 P.3d 1145, 1148-50 (Alaska App. 2005), "the fact that a police officer may have an ulterior motive for enforcing the law is irrelevant for Fourth Amendment purposes ... unless the defendant proves that this ulterior motive prompted the officer to depart from reasonable police practices." Under *Nease*, even when the defendant shows that the officer had some ulterior motive, a traffic stop or an arrest is not "pretextual" absent proof that the officer's decision to make the stop or the arrest "represented a departure from reasonable police practice," given the circumstances in the case. *Id.* at 1149.

Barber does not argue that his arrest qualified as "pretextual" under the *Nease* formulation. Rather, he argues that *Nease* was poorly reasoned, that it created a "test with no teeth", and that it should be overruled. We disagree, and we decline to overrule *Nease*.

Finally, Barber argues that even if *Nease* continues to be the governing law, we must remand Barber's case to the superior court because the judge "never purported

to apply the *Nease* test [to the facts of Barber's case] or make any findings [under] the [*Nease*] test".

It is true that the superior court never expressly mentioned *Nease* when it ruled on Barber's claim of a pretextual arrest. Nevertheless, the superior court's decision appears to be based on reasoning that is analogous to the *Nease* test:

> *The Court*: I don't find [that] this was a pretextual [arrest]. I mean, [the] classic pretext is where somebody gets pulled over ... for a [broken] tail light just so the police can search the car for drugs. This arrest was made, and [Barber's] iPhone was seized, ... on the reasonable belief that there was information [on the phone] relating to the [very] charge for which [Barber] was arrested, ... the weapons charges.

And in any event, we conclude that the superior court's failure to expressly analyze Barber's case under *Nease* can be attributed to the fact that Barber never raised a *Nease* issue in the superior court. The burden is generally on the government to justify warrantless arrests, searches, and seizures. But when a defendant argues that an arrest was pretextual under *Nease*, the *Nease* decision clearly places the burden on the defendant to prove that the challenged police conduct was not reasonable or ordinary under the circumstances. *Id.* at 1148.

For all of these reasons, we uphold the superior court's denial of Barber's suppression motion.

*Barber's attacks on his conviction for discharging a firearm "at or in the direction of" a dwelling*

Barber was convicted of violating AS 11.61.195(a)(3)(B), which makes it a crime to "knowingly ... discharge[] a firearm at or in the direction of ... a dwelling." This conviction was based on the shots that Barber fired at the Bettencourts' truck as it headed out of the driveway and away from the Hornaman residence.

On appeal, Barber argues that both the grand jury evidence and the trial evidence were insufficient to support this charge. More specifically, Barber argues that this evidence was legally insufficient to establish that he was firing "at or in the direction of" any dwelling because (1) Barber was aiming at the truck, rather than purposely trying to direct his fire into a residence, and (2) the residences in the area were not adjoining townhouses, but were instead separate buildings, with enough space in between them to allow a bullet to pass through.

The evidence presented to the grand jury (viewed in the light most favorable to the grand jury's decision) showed that Barber fired a number of shots at the Bettencourts' truck as it headed down the long Hornaman driveway to the street. The police found three bullet holes in the truck: one in the hood, one in the front fender on the passenger side, and one near the rearview mirror on the passenger side. The lead investigator, Detective Sexton, testified that there were "numerous houses" in the area, and that there was a dwelling in Barber's line of fire in "virtually every direction".

This last assertion — that there was a dwelling in Barber's line of fire in "virtually every direction" his gun may have been pointed — was sufficient to support the indictment. Indeed, in a recent unpublished decision, *Glen v. State*, 2015 WL 643383 (Alaska App. 2015), this Court held that a charge of second-degree weapons misconduct

was adequately supported by testimony that there were residential buildings "[in] any direction you look". *Id.* at *2-3.

At Barber's trial, the evidence presented on this point was more detailed. The jurors were given an aerial photograph of the neighborhood , and they were actually taken to the scene to view the area and walk around.

In addition, there was testimony at trial concerning the path taken by the Bettencourts' truck. One of the neighbors testified that, before the Bettencourts made their escape, the truck was parked "nose-in" toward the Hornaman residence. And the jury heard Barber's recorded interview with Detective Sexton, in which Barber stated that the Bettencourts' truck backed up toward the apartment building and then headed out the driveway and onto the street.

All of this evidence, viewed in the light most favorable to the jury's verdict, was sufficient to support the conclusion that Barber fired his revolver "at or in the direction of" a dwelling.

In addition to his sufficiency of the evidence claims, Barber makes a related argument that the jury was misinstructed regarding the culpable mental state required for this offense.

The pertinent statute, AS 11.61.195(a)(3)(B), defines the offense as "knowingly ... discharg[ing] a firearm at or in the direction of ... a dwelling". The jury received an instruction that tracked the wording of this statute. The jury was told that, to prove this offense, the State had to establish that Barber "knowingly discharged a firearm", and that he "discharged the firearm at or in the direction of a dwelling."

Neither party objected to this instruction. But on appeal, the parties point out that neither the statute nor the jury instruction specifies the culpable mental state that applies to the element of "at or in the direction of" a dwelling.

The State contends that "at or in the direction of a dwelling" is a "circumstance" pertaining to the defendant's act of discharging the firearm — and that, under the rule of statutory construction found in AS 11.81.610(b)(2), the culpable mental state that applies to this element is "recklessly". Barber, on the other hand, argues that the statute could be interpreted as requiring proof that the defendant acted "knowingly" with respect to the fact that the firearm was being discharged at or in the direction of a dwelling.

We need not resolve this issue in Barber's case — because, as the State points out, and as Barber appears to concede, the prosecutor argued Barber's case to the jury based on the assumption that it was the State's burden to prove that Barber *knew* that he was discharging his gun "at or in the direction of" one or more dwellings:

> *Prosecutor*: [Y]ou have to find that Mr. Barber acted knowingly. ... [Here,] Mr. Barber was acting intentionally. He meant to be shooting, he knew [that] he was shooting, and he knew there were houses around there. ... [H]e was shooting at those dwellings, in their direction, and he knew exactly what he was doing.

This Court has held that the arguments of counsel can clarify an unclear or ambiguous jury instruction.[3] Here, even though the jury instruction did not specify whether "knowingly" or "recklessly" applied to the element of "at or in the direction of" a dwelling, the prosecutor argued that the jury should convict Barber of this offense because Barber acted knowingly with respect to this element.

Because "knowingly" is a higher culpable mental state than "recklessly", any error in the prosecutor's argument ran in Barber's favor. We therefore conclude that

---

[3]   *O'Brannon v. State*, 812 P.2d 222, 229 (Alaska App. 1991).

the challenged jury instruction did not constitute plain error under the facts of Barber's case.

*The trial judge's refusal to instruct the jury on a person's right to use force to detain a fleeing felon*

Under AS 11.81.390, a person is authorized to use deadly force "when and to the extent the ... person reasonably believes" that the use of this deadly force is necessary to accomplish the arrest of another person who has committed an assaultive felony (*i.e.*, a felony "involv[ing] the use of force against a person").

At Barber's trial, his attorney asked the trial judge to instruct the jury that Barber had a defense to the second-degree weapons misconduct charge (*i.e.*, discharging a firearm at or in the direction of a dwelling) if Barber fired the shots in an effort to arrest the Bettencourts and Smith. The trial judge had doubts whether this "arrest of a felon" defense applied to the crime of shooting at or in the direction of a dwelling. But the judge concluded that, in any case, there was no evidence to support a finding that Barber fired the shots in an effort to make an arrest.

On appeal, Barber renews his argument that he was entitled to a jury instruction on his right to use deadly force to arrest the Bettencourts and Smith — people who had just committed assaultive felonies.

(Barber's brief also speaks repeatedly of the right to use force to terminate an "escape". But AS 11.81.390 only authorizes the use of force to terminate an escape *from custody*. It is clear that the Bettencourts and Smith were not escaping from custody. Thus, if Barber had any right to use force under AS 11.81.390, it was the right to use force to effect an arrest.)

We first note that even if Barber *had* been attempting to arrest the Bettencourts and Smith, it is far from clear whether this would be a defense to shooting at or in the direction of a dwelling. Even when a person has a privilege to use force against another, that use of force must be exercised reasonably, and this requirement of reasonableness includes a duty of care toward bystanders.

This point of law is discussed in R. Perkins & R. Boyce, *Criminal Law* (3rd edition 1982):

> [If] **B** [were] making a murderous assault upon **A** under such circumstances that **A** was privileged to kill **B** in the lawful defense of [his] life[,] [and if], under those circumstances, **A** should shoot at **B** in the proper and prudent exercise of his privilege of self-defense, and should happen unexpectedly ... to cause the death of **C**, [then] **A** should be free from criminal guilt.
>
> . . .
>
> [But this] hypothetical situation ... supposes not only [that **A** had] the privilege to direct deadly force against **B** in the defense of **A**'s life, but also the proper and prudent exercise of this privilege. If ... [**A**] exercised this privilege so imprudently and improperly as to constitute a criminally negligent disregard of the life of the innocent bystander, **C**, [then] the killing of **C** would be manslaughter.

*Perkins & Boyce*, p. 922-23.

In other words, even though a person is under attack and is properly defending himself, he continues to owe a duty of care to bystanders. A person has no "transferred" privilege to attack and injure innocent third parties. Obviously, when a judge or jury assesses the reasonableness of the person's actions, the judge or jury must take into account the fact that the person was justifiably defending himself from attack. But if, even given this extenuating circumstance, a defendant's actions are still reckless

– 12 –

or criminally negligent, then the defendant can be held criminally responsible for the death or injury of a bystander. [4]

There is good reason to think that this same principle — the duty of care to innocent bystanders — would apply to the situation where (1) a violent felony has occurred in a residential neighborhood, (2) a private citizen is weighing the option of shooting a firearm to make an arrest, and (3) there are dwellings located in the line of fire.

But we need not define that duty of care in Barber's case, because we agree with the trial judge that, given the facts of Barber's case, there was insufficient evidence to support a jury instruction on the right to use deadly force to arrest a person who has committed a violent felony. We addressed analogous facts in our memorandum opinion in *Brown v. State*, unpublished, 1999 WL 189360, *3-4 (Alaska App. 1999).

As we noted in *Brown*, AS 11.81.390 authorizes only a reasonable use of deadly force. The person making the arrest may not use force that exceeds the degree "necessary to make the arrest".

As we further explained in *Brown*, this requirement that the deadly force be "necessary" implicitly includes a requirement that reasonable lesser alternatives either have been exhausted or are not reasonably available.

> Obviously, the facts of each case are different. And although the person making an arrest must act reasonably, the reasonableness of this person's actions must be assessed in light of the fact that they must often respond swiftly to a volatile situation. Nevertheless, the legal principle is clear: a person making an arrest — even an arrest for a violent

---

[4] *Ward v. State*, 997 P.2d 528, 533 (Alaska App. 2000) (Judge Mannheimer, concurring).

– 13 –                                                                      2528

felony — normally can not begin the arrest process by shooting the suspect.

*Brown*, 1999 WL 189360 at *4.

In Barber's case, there was no evidence that Barber commanded his fleeing assailants to stop, or fired a warning shot, or took any other non-life-threatening action to stop the Bettencourts and Smith from leaving the scene. Barber simply ran out of the house, aimed his gun at the fleeing men, and fired several shots at (and into) their vehicle. Barber never expressly claimed that his purpose in shooting was to effect an arrest. But even if Barber had claimed this, his action was unreasonable as a matter of law.

In his brief to this Court, Barber suggests that he may have had other evidence to offer in support of this defense, if only the trial judge had allowed it. But Barber's trial attorney did not try to introduce any other evidence on this point, nor did he make an offer of proof describing what additional evidence he might have presented.

Accordingly, we uphold the trial judge's decision not to instruct the jury on the right to use deadly force to arrest a person who has committed a violent felony. Given the evidence presented at Barber's trial, he was not entitled to such an instruction.

*Barber's attacks on his conviction for third-degree weapons misconduct*

Barber was convicted of third-degree weapons misconduct under AS 11.61.200(a)(10), which makes it illegal for a felon

> [to] reside[] in a dwelling knowing that there is a [concealable] firearm in the dwelling ... , unless the [felon] has written authorization to live in a dwelling in which there is a concealable weapon ... from a court of competent

– 14 –

2528

jurisdiction or from the head of the law enforcement agency of the community in which the dwelling is located[.]

Barber first argues that his jury was misinstructed concerning the final clause of this statute — the clause that creates an exception from criminal liability if the felon has written permission from a court or from the head of the local law enforcement agency. Barber argues that this clause defines an additional element of the crime — and that when the State charges a defendant under subsection (a)(10), the State is always required to affirmatively prove (beyond a reasonable doubt) that the defendant did *not* have the kind of written authorization described in the statute.

We reject this interpretation of AS 11.61.200(a)(10). As we explained in *Trout v. State*, 866 P.2d 1323, 1324 (Alaska App. 1994), the general rule is that when a statute defines an exception to the normal scope of criminal liability, a defendant must offer (or point to) evidence that their case falls within the exception. The State is not required to anticipate the exception and negate it in cases where the evidence does not raise the issue. *Ibid.* If a defendant wishes to invoke the exception, then at the very least the defendant must (1) affirmatively raise the exception and (2) point to some evidence from which a reasonable jury could decide that issue in their favor. *Id.* at 1325.

For these reasons, we conclude that the trial judge in Barber's case was not required to instruct the jury on the exception for felons who have written permission to live in a residence where there is a concealable firearm.

Barber also argues that the evidence presented at his trial was insufficient to support a finding that he was "residing" in the Hornaman residence at the time of this incident.

The events in this case took place on December 20, 2010. Matthew Hornaman testified that Barber had been living with them since early December. Hornaman also testified that Barber was staying in his [*i.e.*, Hornaman's] brother's

bedroom, that visitors came to see Barber at the Hornaman residence, and that Barber would invite those visitors into the bedroom.

Detective Sexton testified that Barber told him that he would have been "homeless" if he hadn't been living with the Hornamans. The jury also heard testimony from Detective Sexton that Barber had asked Sexton not to "seize my bong out of the bedroom" because "[bongs are] legal to possess in the home."

The State also points to additional circumstantial evidence that Barber was residing in the Hornaman home: the fact that the Bettencourts knew that they could find Barber at the Hornaman residence, and the fact that, when the Bettencourts knocked at the front door, Barber answered the door the way a resident would.

Viewing this evidence in the light most favorable to the jury's verdict, it was sufficient to support a conclusion by reasonable jurors that Barber was residing in the Hornaman home.

*Why we reverse Barber's conviction for witness tampering*

Barber was convicted of witness tampering under AS 11.56.540(a)(1), which declares that it is unlawful to knowingly induce or attempt to induce a witness to "testify falsely, offer misleading testimony, or unlawfully withhold testimony in an official proceeding".

The State based this charge on evidence that Barber spoke to Matthew Hornaman at the hospital (before Hornaman was interviewed by the police), and that he asked Hornaman not to tell the police that Barber fired shots at their attackers.

Asking someone to withhold pertinent information from the police is not witness tampering. Rather, the statute requires proof that the defendant induced or attempted to induce a witness (including a potential witness) to give false testimony or

to unlawfully withhold testimony at an "official proceeding". The term "official proceeding" is defined as any proceeding where testimony is taken under oath; *see* AS 11.81.900(b)(42).

The State argues that Barber's request to Hornaman could *potentially* be interpreted as a request for Hornaman to unlawfully withhold testimony at some future judicial proceeding (either a grand jury hearing or a trial). We are skeptical of this theory. It is one thing to ask a person to withhold information when they speak to the police, because people generally have no duty to speak to the police; it is another to ask a person to lie or withhold information when they have been placed under oath at an official proceeding. Given the facts of Barber's case, it appears speculative at best for the State to suggest that Barber's conversation with Hornaman amounted to a request for Hornaman to lie or unlawfully withhold information under oath if he was ever summoned to an official proceeding.

But in any event, that is not the way Barber's case was argued to the jury. At Barber's trial, the prosecutor characterized the State's evidence as proving (1) that Barber asked Hornaman to withhold information from *the police*, and (2) that Barber knew that the police were conducting an investigation that would likely result in future official proceedings.

The State's evidence, if believed, was legally sufficient to establish both of these propositions. But that is not the same thing as proving that Barber asked Hornaman to lie or unlawfully withhold information *at a future official proceeding*.

The record shows that the jury likely convicted Barber of witness tampering because he asked Hornaman to withhold information from the police. That was error, and we therefore reverse Barber's conviction for witness tampering.

*Barber's objections to the contents of the pre-sentence report*

Barber objects to three portions of the pre-sentence report prepared by the Department of Corrections.

First, Barber alleges that the pre-sentence report mischaracterizes what Barber said to Hornaman when Barber asked him not to tell the authorities anything about Barber's firing a weapon at the Bettencourts and Smith. According to the pre-sentence report, "[i]n the days following the shooting, Barber asked Matthew Hornaman ... to not say anything about [Barber's] firing the shots[,] *and admitted that the gun he used was a revolver[,] so there would be no shell casings*." (Emphasis added.) During the sentencing hearing, Barber claimed that he never said the italicized portion of the sentence we have just quoted.

We have reviewed the record, and we conclude that Hornaman's testimony supports the pre-sentence report's assertions. Here is what Hornaman said at trial:

> *Prosecutor*: [W]hat, if anything, did [Mr. Barber] say to you in regards to the — those five gun shots?
>
> *Hornaman*: Not to mention them. There was no evidence. Shells wouldn't be found, because it was a revolver.

Barber argues that it is unclear whether Hornaman was saying that Barber mentioned all of these things during their conversation, or whether (instead) Hornaman was making his own side comment that a revolver would not eject shells. But this was an issue of fact for the sentencing judge to resolve.

The judge could reasonably conclude that the pre-sentence report's characterization of Barber's conversation with Hornaman was based on fair inferences

from Hornaman's trial testimony. We therefore uphold the superior court's decision not to alter this portion of the pre-sentence report.

We reach a different conclusion, however, with respect to two other contested portions of the pre-sentence report.

The pre-sentence report contains an assertion that the Bettencourts' assault on Barber, and Barber's ensuing armed response, were related to uncharged drug offenses — that these events were attributable to a "heroin for firearm deal gone bad between Mr. Barber and Jeff Bettencourt". When Barber actively disputed this characterization of events, the sentencing judge responded that it was the pre-sentence investigator's job to express his opinions about the case, and that he (the judge) would give the pre-sentence investigator's opinion the weight it deserved.

This was error. Because Barber affirmatively disputed the pre-sentence investigator's assertion about a drug deal, Alaska Criminal Rule 32.1(f)(5) required the sentencing judge to do one of two things: either (1) resolve the question of whether the pre-sentence report's description was accurate, or (2) strike the pre-sentence investigator's assertion as unnecessary to the court's sentencing decision.

Because the sentencing judge failed to comply with Criminal Rule 32.1(f), we vacate the superior court's decision on this issue, and we direct the superior court to reconsider Barber's objection to this portion of the pre-sentence report.

We reach the same conclusion with respect to Barber's objection to the pre-sentence report's description of the facts underlying Barber's 2010 drug conviction. Again, we vacate the superior court's decision on this issue, and we direct the superior court to reconsider Barber's objection to this portion of the pre-sentence report under the rules prescribed in Criminal Rule 32.1(f).

*Barber's sentencing arguments*

Barber was sentenced for four crimes: second-degree weapons misconduct, third-degree weapons misconduct, witness tampering, and evidence tampering. He received a composite sentence of 11 years with 4 years suspended (7 years to serve).

On appeal, Barber claims that this composite sentence is excessive. But a significant portion of Barber's time to serve — 2 years — is attributable to the sentence he received for witness tampering, and we are reversing that conviction. Barber will have to be re-sentenced, so we decline to reach the question of whether his current composite sentence is excessive. However, several of Barber's other sentencing claims are pertinent to his re-sentencing.

During the sentencing proceedings, the defense attorney argued that Barber's crime of second-degree weapons misconduct (*i.e.*, his discharging a firearm at or in the direction of a dwelling) was mitigated under AS 12.55.155(d)(7). This mitigator applies when "the victim provoked the crime to a significant degree".

Barber's sentencing judge rejected this mitigator under the theory that the people who provoked Barber's armed response — the Bettencourts and Smith — were not "victims" of the crime of discharging a firearm at or in the direction of a dwelling. Because the judge rejected mitigator (d)(7) on this basis, the judge made no finding regarding the nature of the Bettencourts' provocation or the proportionality of Barber's response.

On appeal, the State concedes that the Bettencourts and Smith were "victims" of the offense for purposes of mitigator (d)(7). Nevertheless, the State argues that we should uphold the sentencing judge's ruling. The State contends that the record undisputedly shows that Barber's response to the Bettencourts' provocation was disproportionate — and that Barber therefore can not claim the benefit of mitigator

(d)(7). [5] The State also contends that, to the extent Barber's claim of provocation is debatable, Barber failed to prove his claim by clear and convincing evidence.

We reject the State's contention that the record allows us to affirm the sentencing judge's decision on these other grounds. As we have explained, because the judge wrongly believed that Barber was precluded from relying on mitigator (d)(7) as a matter of law, the judge made no findings regarding the nature of the provocation, the nature of Barber's response, and whether Barber had met his burden of proof. We therefore vacate the sentencing court's ruling on mitigator (d)(7), and we direct the court to reconsider this mitigator in connection with Barber's re-sentencing.

In the superior court, Barber's attorney also argued that Barber's offense of evidence tampering was mitigated under AS 12.55.155(d)(9), which applies when a defendant's conduct is among the least serious within the definition of the offense. The defense attorney pointed out that, even though Barber hid the handgun in his neighbor's hot tub, the gun was found the same evening, and the State was able to use the gun as evidence at grand jury and at trial.

The sentencing judge rejected mitigator (d)(9) because the judge concluded that Barber's act of evidence tampering (*i.e.*, his act of hiding the revolver in the hot tub) had to be viewed in conjunction with Barber's further act of asking Hornaman to conceal the shooting from the police. The judge declared that, viewed together, these two aspects of Barber's conduct "represent[ed] an ongoing [effort] by Mr. Barber to try [to] avoid responsibility for [his] acts and to [impair] the integrity of the investigation." We agree that, given these facts, Barber failed to prove that his conduct was among the least serious encompassed by the evidence tampering statute.

---

[5] *See Roark v. State*, 758 P.2d 644, 647 (Alaska App. 1988).

*Barber's conditions of probation*

Barber objects to several of his probation conditions.

Two of Barber's conditions are related to his possession and consumption of alcoholic beverages. Condition 9 prohibits Barber from consuming alcoholic beverages. Special Condition 7 goes considerably farther: it prohibits Barber from possessing, handling, or purchasing alcoholic beverages, and it further requires him to submit to searches of his person, his personal property, his residence, and his vehicle(s) for the presence of alcoholic beverages. And Special Condition 8 prohibits Barber from entering any establishment where "alcohol is the main item for sale".

Barber objected to these conditions, pointing out that he had no history of alcohol abuse, and that his offenses were not related to alcohol. The sentencing judge nevertheless upheld these conditions under the theory that they were justified by Barber's history of drug abuse. The judge stated that "[it was] not at all uncommon that people who have substance abuse issues with one particular type of substance will [switch] over to another one when they can no longer engage in the [first one]." The judge also stated that he was "convinced that ... eliminating all [intoxicating] substances [would] most effectively promote [Barber's] rehabilitation."

We conclude that the sentencing court's analysis is not sufficient to establish that these three probation conditions are sufficiently related to Barber's rehabilitation, or to the prevention of future criminal acts, to pass muster under the test announced in *Roman v. State*, 570 P.2d 1235, 1240 (Alaska 1977).

We will assume that the sentencing judge was correct when he asserted that people who use illicit drugs will sometimes switch to using alcoholic beverages if they are deprived of illicit drugs. Nevertheless, it is not illegal to get intoxicated through the use of alcoholic beverages. And the record contains little evidence that Barber engages

in criminal activity *because of* intoxication. Barber's past criminal convictions were simply for the illicit possession of controlled substances. If Barber had not used controlled substances and had, instead, used alcohol as a lawful means of achieving intoxication, he would not have been prosecuted for a crime.

Thus, there is little in the record to support the sentencing judge's conclusion that "eliminating all [intoxicating] substances" from Barber's life would "most effectively promote his rehabilitation". Accordingly, we direct the superior court to strike Condition 9 and Special Conditions 7 and 8.

We also direct the superior court to amend Special Condition 6 so that it no longer speaks of products relating to alcohol.

In a separate argument, Barber challenges Condition 12, which directs him to "[a]bide by any special instructions given by ... probation officers of the Department of Corrections intended to implement this [judgement] and the terms of the defendant's probation." Barber argues that this condition is improper because it potentially grants an impermissibly broad authority to his probation officer(s). But this Court has previously affirmed the validity of this probation condition.[6] And Barber retains the right to challenge any special instruction he may receive in the future from his probation officer if he believes that the special instruction exceeds the probation officer's authority, or that it is otherwise unreasonable.

Barber next challenges Special Condition 1, which prohibits him from knowingly associating with "anyone who is in ... immediate possession of firearms", and from knowingly being present "anywhere a firearm is present". Barber argues that this condition is overly vague and potentially overbroad. We agree. As written, the

---

[6] *See, e.g., Phillips v. State*, 211 P.3d 1148, 1153 (Alaska App. 2009); *Dayton v. State*, 120 P.3d 1073, 1084 (Alaska App. 2005).

condition appears to prohibit Barber from visiting a police station, talking to police officers, or "associating" with any other citizen who exercises their right to openly carry a firearm. The condition also appears to prohibit Barber from entering the premises of sporting goods stores or even grocery/general merchandise stores that sell firearms.

Upon remand, the superior court is directed to reformulate Special Condition 1 to cure these problems.

Barber also challenges Special Condition 3, which (1) prohibits him from using or possessing controlled substances without a prescription; (2) prohibits him from having "any paraphernalia normally associated with the illicit use of drugs; and (3) requires him to submit to searches for "illicit drugs or drug paraphernalia".

Given Barber's criminal history, it was reasonable for the sentencing court to prohibit Barber from possessing controlled substances without a prescription, and to require Barber to submit to searches for prescriptionless controlled substances.

We note, however, that there are potential vagueness problems in the phrase "paraphernalia normally associated with the illicit use of drugs". See this Court's decision in *Myers v. Anchorage*, 132 P.3d 1176 (Alaska App. 2006). The superior court may wish to re-examine this aspect of Special Condition 3.

Barber next challenges Special Condition 4, which prohibits him from knowingly associating with any person who illegally uses controlled substances, and from knowingly entering or remaining in any place where controlled substances are illegally used, manufactured, grown, or sold. Barber argues that the word "place" is too vague, because it potentially prohibits him from remaining in a public place, such as a park or a sports stadium, if he observes any person using controlled substances.

We agree with Barber that the challenged condition is potentially overbroad if it applies to such situations, and we direct the superior court to amend Special Condition 4 with a narrowing definition of "place".

Finally, Barber challenges Special Condition 9, which requires him to submit to searches of his personal computer and to searches of any other electronic devices he owns that are capable of communication (*e.g.*, a mobile phone or a tablet) "to determine if [Barber is] knowingly associating with individuals who [he knows] use or sell illegal controlled substances".

This provision is, in essence, a general warrant authorizing Barber's probation officer to search through the entire contents of Barber's digital files — his word processing documents, his emails, his text messages, his downloads, the log of his phone calls, his Internet browsing history, his calendar, his contact lists, his photographs, etc.

As the United States Supreme Court recently noted in *Riley v. California*, 573 U.S. __, 134 S.Ct. 2473 (2014),

> [A] cell phone search [will] typically expose to the government far more [information] than the most exhaustive search of a [person's] house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form [except in] the phone [itself].

*Riley*, 573 U.S. at __, 134 S.Ct. at 2491.

Given the immense intrusion on Barber's privacy that is authorized by Special Condition 9 — an intrusion far greater than any search of his house for drugs or weapons — the sentencing court was required to specially scrutinize this probation condition to ensure that it was narrowly tailored to the goals of probation recognized in *Roman*, and that the condition did not unnecessarily infringe on Barber's constitutional rights of privacy, liberty, and freedom of association. *See Dawson v. State*, 894 P.2d 672, 680 (Alaska App. 1995).

The record shows that the sentencing judge did not engage in this analysis. We therefore vacate Special Condition 9. The sentencing court is authorized to re-assess whether Special Condition 9, or some narrower form of it, might be justified under the facts of Barber's case.

*Conclusion*

We reverse Barber's conviction for witness tampering, but we affirm his other convictions.

As explained in this opinion, we direct the superior court to address and resolve two of Barber's challenges to the pre-sentence report under Criminal Rule 32.1(f).

We direct the superior court to reconsider Barber's proposed mitigator (d)(7) with regard to Barber's conviction for second-degree weapons misconduct.

Finally, we direct the superior court to either delete, amend, or reconsider the conditions of probation that we discussed in the preceding section of this opinion.